FILED

2010 Feb-16  PM 01:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A
# PART ONE

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ALABAMA

3                SOUTHERN DIVISION

4     REGINALD W. GILBERT,   )

5              Plaintiff,       )

6     VS.                      )CIVIL ACTION NO:

7     WAL-MART STORES, INC.,)2:08-CV-2405-RDP

8                              )DEPOSITION OF:

9          Defendant.      )REGINALD GILBERT

10          S T I P U L A T I O N S

11          IT IS STIPULATED AND AGREED, by

12    and between the parties through their

13    respective counsel, that the deposition

14    of:

15              REGINALD GILBERT,

16    may be taken before Dana Gordon,

17    Commissioner and Notary Public, State at

18    Large, at the Law Offices of Johnston,

19    Barton, Proctor & Rose, Colonial Brookwood

20    Center, 569 Brookwood Village, Suite 901,

21    Birmingham, Alabama 35209, on the 19th day

22    of November, 2009, commencing at

23    approximately 9:53 a.m.

**Page 2**

```
 1        IT IS FURTHER STIPULATED AND
 2   AGREED that the signature to and reading of
 3   the deposition by the witness is waived,
 4   the deposition to have the same force and
 5   effect as if full compliance had been had
 6   with all laws and rules of Court relating
 7   to the taking of depositions.
 8
 9        IT IS FURTHER STIPULATED AND
10   AGREED that it shall not be necessary for
11   any objections to be made by counsel to any
12   questions, except as to form or leading
13   questions, and that counsel for the parties
14   may make objections and assign grounds at
15   the time of the trial, or at the time said
16   deposition is offered in evidence, or prior
17   thereto.
18                    ***
19
20
21
22
23
```

**Page 3**

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4        LEE WINSTON
 5        Attorney at Law
 6        Winston Cooks
 7        Two - 20th Street North
 8        Suite 1330
 9        Birmingham, Alabama  35203
10
11   FOR THE DEFENDANT:
12        JONATHAN HARBUCK
13        HOLLY CLEMENTE
14        Attorneys at Law
15        Johnston, Barton, Proctor & Rose
16        Colonial Brookwood Center
17        569 Brookwood Village
18        Suite 901
19
20   ALSO APPEARING:
21        Mike Chandler
22
23
```

**Page 4**

```
 1                 I N D E X
 2                        PAGE:
 3   EXAMINATION BY MR. HARBUCK     6
 4
 5
 6           E X H I B I T   L I S T
 7
 8   Exhibit No. 1          113
 9   Exhibit No. 2          114
10   Exhibit No. 3          117
11   Exhibit No. 4          118
12   Exhibit No. 5          121
13   Exhibit No. 6          122
14   Exhibit No. 7          126
15   Exhibit No. 8          129
16   Exhibit No. 9          145
17   Exhibit No. 10         156
18   Exhibit No. 11         163
19   Exhibit No. 12         166
20   Exhibit No. 13         176
21   Exhibit No. 14         196
22   Exhibit No. 15         202
23   Exhibit No. 16         203
```

**Page 5**

```
 1        I, Dana Gordon, a Court Reporter
 2   of Birmingham, Alabama, and a Notary Public
 3   for the State of Alabama at Large, acting
 4   as Commissioner, certify that on this date,
 5   as provided by the Federal Rules of Civil
 6   Procedure and the foregoing stipulation of
 7   counsel, there came before me on the 19th
 8   day of November, 2009, at the law offices
 9   of Johnston, Barton, Proctor & Rose,
10   Colonial Brookwood Center, 569 Brookwood
11   Village, Suite 901, Birmingham, Alabama
12   35209, commencing at approximately
13   9:53 a.m., REGINALD GILBERT, witness in the
14   above cause, for oral examination,
15   whereupon the following proceedings were
16   had:
17        REGINALD GILBERT,
18   being first duly sworn, was examined and
19   testified as follows:
20        THE COURT REPORTER:  Usual
21   stipulations?
22        MR. WINSTON:  Yes.
23        MR. HARBUCK:  Yes.
```

Page 6

1  EXAMINATION BY MR. HARBUCK:
2  Q    State your full name, please.
3  A    Reginald Winston Gilbert.
4  Q    Mr. Gilbert, my name is Jon
5  Harbuck. We met for the first time a few
6  minutes ago. Have you ever given a
7  deposition before?
8  A    No, sir.
9  Q    Let me explain what we're doing
10  here today just so that we have the same
11  set of ground rules.
12      I represent Wal-Mart in this
13  lawsuit. My co-counsel Holly Clemente is
14  down here and so is Mr. Chandler. But I
15  will ask questions of you seeking to
16  understand what the claims are that you're
17  making in this case. I'm not asking you
18  lawyer questions. That's for me and
19  Mr. Winston to work out. I'm only asking
20  questions to try to understand the facts as
21  you understand them. Am I clear on that?
22  A    Yes.
23  Q    If I ask you a question and you

Page 7

1  don't understand it, let me know and I'll
2  be happy to try to rephrase the question.
3  Fair enough?
4  A    Uh-huh.
5  Q    If you answer my question, I'm
6  going to assume that you've understood my
7  question as I have asked it. Can we have
8  that agreement?
9  A    Yes.
10  Q    You're doing a pretty good job.
11  Try to remember to speak up so that the
12  court reporter can get your answers and try
13  to speak orally rather than nods or shakes
14  of the head because it's hard for her to
15  take those down.
16      This is not an endurance
17  contest. We'll take regular breaks. If
18  you need a break for any reason, just let
19  me know and we'll take a break. The
20  only -- the only thing that I would ask is
21  if I have already asked a question before
22  the break, let's get the question answered
23  and then we'll go on break. Is that -- is

Page 8

1  that understood?
2  A    Yes.
3  Q    Let's start with a little bit of
4  background. Where do you live?
5  A    In Calera, Alabama.
6  Q    Your home address, please.
7  A    35 -- 305 Oakwell Circle,
8  Calera, Alabama --
9  Q    How long --
10  A    -- 35040.
11  Q    Thank you. How long have you
12  lived at that address?
13  A    That address is coming up on
14  three years. Two and a half years.
15  Q    Where did you live before that?
16  A    963 Savannah Lane in Calera,
17  Alabama.
18  Q    Did you grow up in Calera?
19  A    No, sir.
20  Q    Where did you grow up?
21  A    Los Angeles, California.
22  Q    When did you move to this area?
23  A    '96.

Page 9

1  Q    What's the highest level of
2  formal education that you've completed?
3  A    Well, I guess Banking Institute.
4  Q    Is that like a post graduate
5  level?
6  A    Trade -- it's like a trade
7  school.
8  Q    Trade school. Banking
9  Institute. Where is that located?
10  A    Wilshire Boulevard, Los Angeles,
11  California.
12  Q    What kind of -- well, did you
13  complete the training at Banking --
14  A    Yes, I did.
15  Q    -- Institute? What kind of a
16  degree do you get from that?
17  A    A banking certificate.
18  Q    Does that qualify you to be a
19  banker?
20  A    To work in banking.
21  Q    In the banking industry. Before
22  that you went -- did you complete high
23  school?

**Page 10**

1 A       Fairfax High School and then
2 Woodrow Wilson Adult School.
3 Q       And that was in Los Angeles
4 also?
5 A       Yes.
6 Q       What was the last job that you
7 held before you went to work for Wal-Mart?
8 A       I want to think it was the
9 Federal Reserve Bank.
10 Q       That was here in Birmingham?
11 A       Los Angeles branch.
12 Q       When you went to work with
13 Wal-Mart, you were already living in this
14 area, correct?
15 A       Yes.
16 Q       So, was there a period of time
17 when you were unemployed between Los
18 Angeles and Birmingham?
19 A       Yes.
20 Q       How long was that?
21 A       Three years.
22 Q       Are you married?
23 A       Yes.

**Page 11**

1 Q       What is your wife's name?
2 A       Adelle Zaragoza Gilbert.
3 Q       How long have y'all been
4 married?
5 A       I think we're coming up on 10.
6 Q       That's okay.  It happens to me,
7 too.
8 A       We're coming up on 10, I
9 believe.
10 Q       Do you have any children?
11 A       Yes.
12 Q       How many?
13 A       Two.
14 Q       Are they under the age of 19?
15 A       Yes.
16 Q       Do you have any other family
17 here in the Birmingham area?
18 A       Yes.
19 Q       Who would that be?
20 A       My mother's side of the family.
21 Q       How many -- is your mother still
22 living?
23 A       Yes.

**Page 12**

1 Q       She lives in this area?
2 A       No.
3 Q       What is her name?
4 A       Mary Alice Greathouse.
5 Q       She lives back in Los Angeles?
6 A       Yes.
7 Q       Who among her family lives in
8 the Birmingham area?
9 A       Her brother, her sister, nieces
10 and nephews.
11 Q       Are their names Greathouse as
12 well?
13 A       Yes.
14 Q       All surnames Greathouse?
15 A       I believe so.
16 Q       Does your wife's family live in
17 this area?
18 A       They do.
19 Q       And her maiden name was
20 Zaragoza?
21 A       Yes.
22 Q       Are they all surnames Zaragoza?
23 A       Yes.  Mayor Zaragoza of Vestavia

**Page 13**

1 Hills and her brother Chris Zaragoza.
2 Q       Any other immediate family
3 living in this area?
4 A       Of mine?
5 Q       Yes.
6 A       No.
7 Q       How about the rest of northern
8 Alabama, say from the Tennessee state line
9 down to around Clanton?
10 A       If they -- if they are, I don't
11 know them or I haven't met them.
12 Q       Have you ever served in the
13 military?
14 A       No.
15 Q       Do you hold any other
16 certificates, licenses or degrees other
17 than the one you told me about from the
18 Banking Institute since you completed high
19 school?
20 A       No.
21 Q       Now, you currently work I
22 believe at the Wal-Mart Supercenter in
23 Alabaster; is that correct?

(Pages 14 to 17)                                                              5

## Page 14

1   A     Yes.
2   Q     And you have been there since
3   sometime about the middle of last year?
4   A     Uh-huh.
5   Q     That's yes?
6   A     Yes. I'm sorry. Yes.
7   Q     That's okay. I'll try to remind
8   you and so will your attorney.
9   A     Thank you.
10  Q     Did you -- what is your job
11  title at Alabaster?
12  A     Maintenance.
13  Q     What shifts do you normally
14  work?
15  A     I work the third shift.
16  Q     You just work nights?
17  A     Yes.
18  Q     What hours are those?
19  A     10:00 to 7:00.
20  Q     Did you work last night?
21  A     No, I didn't.
22  Q     So, there's no -- there's no
23  issue with fatigue or lack of sleep with

## Page 15

1   you being here giving a deposition today?
2   A     Right. I was -- right.
3   Q     Did you -- do you -- are you on
4   the schedule to work tonight?
5   A     Yes.
6   Q     Now, on the Alabaster -- in that
7   store your title is maintenance. Are you
8   paid by the hour?
9   A     Yes.
10  Q     You were paid by the hour when
11  you worked previously at the store in
12  Vestavia, correct?
13  A     Yes.
14  Q     When I refer to the Vestavia
15  store, I'm referring to the neighborhood
16  market over the mountain that Mr. Chandler
17  manages. And you were hourly there?
18  A     Yes.
19  Q     Have you ever held any position
20  at Wal-Mart other than an hourly paid
21  position?
22  A     No.
23  Q     You've never been salaried?

## Page 16

1   A     No.
2   Q     What do you -- as close as you
3   can get it, do you -- can you tell me how
4   much you are paid today working at
5   maintenance in Alabaster?
6   A     My hourly salary?
7   Q     Yes, sir.
8   A     18.40.
9   Q     Do you get any kind of a shift
10  differential for working nights?
11  A     Yes, I do.
12  Q     What is that?
13  A     A dollar.
14  Q     So, your weekly rate is
15  calculated -- your weekly pay is calculated
16  on $19.40 times the number of hours you
17  work?
18  A     No. 18.40. The dollar is added
19  to that 18.40. So, it would be 17.40 if I
20  was working day shift.
21  Q     So, the 18.40 includes the shift
22  differential?
23  A     Yes.

## Page 17

1   Q     About how many hours do you work
2   a week?
3   A     40.
4   Q     40?
5   A     Yes.
6   Q     Do you ever get any overtime?
7   A     No.
8   Q     Now, that's a 24-hour
9   supercenter, correct?
10  A     Yes.
11  Q     In maintenance on the third
12  shift how many other folks work with you in
13  maintenance?
14  A     On the payroll we have six, but
15  we're working with five. One is out on
16  medical leave.
17  Q     Who is your supervisor?
18  A     It would be the store --
19  overnight store manager.
20  Q     And what is the overnight
21  manager's name?
22  A     There's several.
23  Q     Okay.

Page 18

1   A        There's Rod Hill.  He's a
2   co-manager.  Turi Cason.  He's a
3   co-manager.  And Angela.  And I don't know
4   Angela's last name, but she's an assistant.
5   Q        How many co-managers does the
6   Alabaster store have?
7   A        I believe four.
8   Q        Do you know how many assistants?
9   A        No.
10  Q        Who is the store manager?
11  A        Robert Beasley.
12  Q        Does Mr. Beasley ever work third
13  shift?
14  A        Once, maybe twice.
15  Q        You don't see him very often?
16  A        No.
17  Q        You normally will see the
18  overnight co-manager who is on duty for
19  that particular night?
20  A        Right.
21  Q        How do you get along with Rod
22  Hill?
23  A        Excellent.

Page 19

1   Q        Y'all don't have any problems?
2   A        Not at all.
3   Q        What about Tony Cason?
4   A        Turi.
5   Q        Turi.  I'm sorry.
6   A        T-U-R-I, Turi.
7   Q        Do you get along okay with Turi
8   Cason?
9   A        I do.
10  Q        How about Angela, last name
11  unknown?
12  A        As well.
13  Q        Have you had any occasion since
14  you worked in the store in Alabaster to
15  make any kind of complaints or raise any
16  issues about your job environment or your
17  job circumstances?
18  A        My current position?
19  Q        Yes.
20  A        No.
21  Q        No open door complaints or
22  hotline issues?
23  A        Have I made any?

Page 20

1   Q        Yes.
2   A        No.
3   Q        Have you had any -- any
4   discussions with any of the managers you've
5   named or any of the other supervisors over
6   you at Alabaster about -- about your job
7   circumstances, any informal complaints or
8   any kind of issues that you needed
9   addressed and wanted to talk about?
10  A        About my position?
11  Q        Yes.
12  A        As a maintenance person?
13  Q        Yes.
14  A        No.
15  Q        Any complaints or discussions
16  with any of them about how much you're
17  paid?
18          MR. WINSTON:  I will object to
19  asked and answered.
20          THE WITNESS:  What was that?
21          MR. WINSTON:  From time to time
22  I may object to the form of the question,
23  but you can answer as long as you

Page 21

1   understand the question.
2   Q        I had asked the question and
3   your attorney objected, but you can answer
4   the question about whether you've had any
5   complaints or any discussions even not
6   formal, but just dissatisfaction or some
7   discussion with your managers about how
8   much you're paid.
9   A        Well, if he objected, I --
10          MR. WINSTON:  You can answer.
11  As long as you understand the question, you
12  can answer.  I just -- from time to time I
13  may object through the course of the day.
14  Unless I tell you otherwise -- now, if I
15  don't want you to answer, I'll tell you
16  don't answer.
17  Q        Do you understand that?
18  A        No.  Run that by me again.
19  Q        I'll reiterate what Mr. Winston
20  has told you that from time to time in this
21  environment, in these kind of proceedings
22  we lawyers object to questions.  But
23  because there's not a judge here to rule on

7

**Page 22**

1   the objection, we are simply making a
2   record of the objection that we can take up
3   with the Court later if we need to.
4       A     Okay.
5       Q     So, as Mr. Winston just told
6   you, if he objects to a question, it's to
7   make a record of it, but you're free to
8   answer the question if you understand it.
9   And if you don't understand it, let me know
10  and I'll rephrase it.  If Mr. Winston tells
11  you not to answer a question, I won't ask
12  that question again.  He and I will work it
13  out with the Court if we need to.  Is that
14  fair enough?
15      A     Yeah.  This is my first time.  I
16  don't know anything about this.
17      Q     That's all right.  That's okay.
18  That's why we have the ground rules so that
19  we — so that we come to an understanding.
20  We do this a lot.  And you know, if we were
21  in your environment, we'd be just as
22  uncertain of ourselves.
23           So, to get to back to my

**Page 23**

1   question, have you had any reason
2   informally to complain with your managers
3   or discuss with your managers or
4   supervisors how much you're paid?
5       A     No.
6       Q     Any complaints about your job
7   duties?
8       A     No.
9       Q     Any complaints about anybody
10  else on the crew that you work with?
11      A     Yes.
12      Q     Your other maintenance fellows?
13      A     Yes.
14      Q     What complaints have you raised
15  with managers about other members of your
16  crew?
17      A     Productivity.
18      Q     Productivity.  Any specific
19  members of the crew?
20      A     Yeah.
21      Q     Who?
22      A     I don't know the guy's last
23  name, but one guy's name is Rick.  The

**Page 24**

1   other guy's name is Sam.
2       Q     Rick and Sam.  What — who did
3   you — what member of management or
4   supervisor above you did you take the
5   complaints about Rick and Sam to?
6       A     Rod, Turi, Angela, all of them.
7       Q     You've discussed them.  And your
8   complaint is they don't work hard enough?
9       A     Not work hard enough.  They
10  don't do what we're supposed to do.
11      Q     Help me understand what you mean
12  by that.
13      A     Well, we have a job to do at
14  night and they don't perform it up to the
15  company's expectations.
16      Q     Is this to your knowledge a — a
17  performance issue that has been discussed
18  with them by any of these managers?
19      A     To my knowledge, no.
20      Q     So, to your knowledge, it's
21  not — the managers don't have a problem
22  with the work they're doing, but you do?
23           MR. WINSTON:  Object to the

**Page 25**

1   form.
2       Q     Well, let me break it down.
3   You've complained that you don't think that
4   they're doing the job up to the standard
5   expected.  Are you telling me that the
6   managers disagree with you on that?
7       A     No.  The managers have also said
8   the same thing.
9       Q     But do you understand whether or
10  not the managers have — have counseled any
11  of them about their productivity?
12      A     Not to my knowledge.
13      Q     Not to your knowledge.  Any
14  other complaints about any of the other
15  members of the maintenance crew that you
16  work with in Alabaster?
17      A     No.  There was another guy, but
18  he no longer works for Wal-Mart anymore.
19      Q     You had complaints about his
20  performance?
21      A     No.  About his — some
22  allegations that he made towards me and
23  another associate, and we addressed it with

### Page 26

```
 1  management.
 2  Q       Let's talk about that.  What is
 3  this individual's name?
 4  A       His name was Kenny.  I don't
 5  know his last name.
 6  Q       Well, I assume it's still Kenny,
 7  but you said --
 8  A       I don't know his last name.
 9  Q       And he worked on the maintenance
10  crew with you?
11  A       He did.
12  Q       What do you understand his
13  complaint was?
14  A       He made some allegations about
15  marijuana usage at the store.
16  Q       Allegations against whom?
17  A       David -- I can't think of
18  David's last name.  He works in frozen.
19  And myself.
20  Q       Is David still there?
21  A       Yes.
22  Q       And he was -- he was claiming
23  that you and David used marijuana in the
```

### Page 27

```
 1  store?
 2  A       I don't know if it was in the
 3  store, in the store property, but he made
 4  these allegations.
 5  Q       How do you -- how did you come
 6  to learn about these allegations?
 7  A       From David.  And when David --
 8  from David and David went to management
 9  about it.
10  Q       So, you understood -- are you
11  telling me that you understand that Kenny
12  was not complaining to management, was not
13  making a formal complaint to management; he
14  was just stating that the two of y'all used
15  marijuana at work?
16  A       He made the statement to
17  management.
18  Q       To management?
19  A       Yes.
20  Q       David heard about it, David --
21  A       Management confronted David
22  about it.
23  Q       Did management confront you
```

### Page 28

```
 1  also?
 2  A       Yes.  He confronted me about it
 3  and with a tape recorder in his pocket.
 4  And he wanted to tape record my
 5  conversation, and I denied talking to him.
 6  Q       Management did this or Kenny
 7  did?
 8  A       Management did this.
 9  Q       Who was the manager?
10  A       Frank, and I don't know his last
11  name.
12  Q       What is his title?
13  A       He was an assistant manager, but
14  he's -- from what I understand, he's acting
15  assistant right now until he's transferred
16  to another store.
17  Q       Does he ever work nights?
18  A       He was the second assistant over
19  night.
20  Q       So, Frank asked to interview you
21  on the record.  You said no?
22  A       He asked to interview me with a
23  tape recorder, to tape record my
```

### Page 29

```
 1  conversation and I said no.
 2  Q       And you said no.  Did you have
 3  any interviews with anybody else?
 4  A       Yes.  I reported it to the store
 5  manager.  I reported that incident to the
 6  store manager.
 7  Q       What incident?
 8  A       Frank and the tape recorder and
 9  confronting me about Kenny.
10  Q       What did the store manager say
11  to you about that?
12  A       He talked to Frank.  He had a
13  conversation with Frank.  He just told me
14  thank you for the information and never
15  said nothing about the allegations, and
16  then I never heard anything else about it
17  again.
18  Q       Was any action taken against
19  David?
20  A       David never heard anything else
21  about it again also.
22  Q       Any action taken against Kenny?
23  A       Not to my knowledge.
```

Page 30

1    Q        Are you aware of any other
2  complaints made against you while you've
3  been -- since you've been at Alabaster?
4    A        No.
5    Q        Have you made complaints about
6  anybody else other than the ones that
7  you've already told me about and we've
8  discussed?
9    A        I did.
10   Q        What other complaints have you
11 made?
12   A        There was an investigation about
13 the -- there was an investigation about a
14 member of management having a sexual
15 relation with another member of management
16 at our store.  And this was done by the
17 store manager.  He actually interviewed
18 several people.
19   Q        And that's an allegation that
20 you brought?
21   A        No, I didn't.
22   Q        Who was it who brought that
23 allegation?

Page 31

1    A        I have no idea.  He just
2  interviewed associates about it.
3    Q        You were one of those
4  interviewed?
5    A        I was one of those associates
6  interviewed of the several.
7    Q        Do you know anything about how
8  that investigation was completed or whether
9  it was completed?
10   A        We don't know if it's completed
11 or not.
12   Q        Do you know if there was -- if
13 the allegation was substantiated in any
14 way?
15   A        What do you mean by that?
16   Q        Was the allegation -- do you
17 know whether the allegation was found to be
18 true or not?
19   A        We don't know.
20   Q        Did you know anything about a
21 member of management having a sexual
22 relationship with another member of
23 management?

Page 32

1    A        I do.
2    Q        And you gave a statement to that?
3    A        I did.
4    Q        Do you have any complaints about
5  the way that investigation has been
6  handled?
7    A        I do.
8    Q        What complaints do you have?
9    A        I feel like it's being brushed
10 under the table.
11   Q        Do you know if anybody else has
12 given a statement?
13   A        Several people have given that
14 statement.
15   Q        Was your statement recorded?
16   A        No.
17   Q        Did you write a statement?
18   A        No, I didn't write a statement,
19 but the statement was taken from the
20 assistant that sat in with the store
21 manager.
22   Q        So, you were interviewed and the
23 assistant --

Page 33

1    A        Took notes.
2    Q        -- who was in the meeting took
3  notes?
4    A        Yes.
5    Q        Was that the same assistant
6  Frank who asked to record an interview with
7  you?
8    A        No.
9    Q        I may have asked you and if you
10 answered already, I apologize, but I don't
11 remember.  Do you know if anybody else has
12 been interviewed and given a statement in
13 connection with this investigation?
14   A        Several.
15   Q        Do you know if the investigation
16 is closed, or is it still ongoing?
17   A        We wouldn't know as -- as hourly
18 associates we wouldn't know.
19   Q        Your answer to my question then
20 I gather is no, you don't know whether it's
21 open or it's still --
22   A        I don't.
23   Q        It's been closed?  How long ago

Page 34

1    was this interview that you gave?
2    A        Maybe a month or two.
3    Q        Any other complaints,
4    investigations, allegations or anything
5    else since you've been in Alabaster that
6    you've been involved in?
7    A        Not to my knowledge, no.
8    Q        And I believe you told me that
9    as far as you know, other than that
10   allegation by Kenny about marijuana use,
11   nobody else has made any complaints about
12   you since you've been at Alabaster?
13   A        No one has brought anything to
14   my attention.
15   Q        Have you had any personal
16   disputes with anybody at the Alabaster
17   store other than anything that we've
18   already talked about?
19   A        No.
20   Q        What do you understand Wal-Mart
21   policy to be concerning folks who make
22   complaints about other people in the
23   workplace?  That is, if you've got a

Page 35

1    complaint about somebody else, what do you
2    understand the procedure is to resolve that
3    complaint?
4    A        My understanding was that -- get
5    both sides.  If there's a complaint by
6    someone, you get that statement and you get
7    the other statement from the other person.
8    Q        And do you have an understanding
9    about who it is who gets those statements;
10   that is, who's responsible for gathering
11   the evidence?
12   A        The management team, to my
13   knowledge.
14   Q        Salaried members of management?
15   A        Uh-huh.
16   Q        What about getting statements
17   from others who are perhaps witnesses?  Do
18   you understand that that's part of the
19   procedure?
20   A        What is the question?
21   Q        My question is do you understand
22   that the members of management who are
23   conducting the investigation, part of that

Page 36

1    procedure is also to collect statements
2    from witnesses; that is, not just the two
3    people who have a problem with one another,
4    but anybody else who might be a witness to
5    any kind of conflict?  Do you understand my
6    question?
7    A        I really don't.
8    Q        Well, let's go back to the
9    situation with Kenny.  Did you give a
10   statement to anybody in connection with
11   that allegation?
12   A        No.
13   Q        Did David give a statement to
14   anybody about that allegation?
15   A        I don't know.
16   Q        You testified that you
17   understood that several people have given
18   statements about the complaint regarding
19   the two members of management in a sexual
20   relationship.
21   A        Right.
22   Q        Do you understand that they've
23   also been interviewed?

Page 37

1    A        Yeah.  We were all being called
2    in one after another that morning by the
3    store manager.  Over the intercom system in
4    the store we all were being called back
5    there one after another.
6    Q        But you were having these
7    interviews back in a private area?
8    A        In the manager's office.
9    Q        If you have a particular
10   complaint about anybody or about anything,
11   what do you understand the complaint
12   procedure to be?
13   A        Go to management.
14   Q        Are you allowed to do that on
15   work time?
16   A        Yeah.
17   Q        Are you familiar with the open
18   door policy?
19   A        Yes.
20   Q        How does that work?
21   A        It's a confidential conversation
22   that associates have with management
23   members.

Page 38

1  Q      Can you define for me the word
2  "confidential" as you have used it?
3  A      Between the two.
4  Q      Do you understand that if one
5  associate makes an allegation about another
6  associate that management in the course of
7  its investigation may have to discuss the
8  particulars with that other associate?
9  A      I don't follow you on that.
10 Q      Well, let's go back to your
11 question -- your definition of
12 confidential.  If you make a complaint
13 about another member of your team, perhaps
14 about his productivity and the -- you make
15 that complaint to a member of management
16 and you understand that management's job is
17 to investigate that complaint and that they
18 would talk to that other member that you've
19 complained about, correct?
20 A      Right.
21 Q      Do you understand that the
22 member of management might use your name in
23 connection with that investigation; that

Page 39

1  is, that the manager might tell the other
2  associate, hey, Mr. Gilbert has a problem
3  with your productivity?  Do you understand
4  that that's the way it's supposed to work?
5  A      No, I wasn't aware that was the
6  way it was supposed to work.
7  Q      So, when you use the word
8  "confidential," are you saying that you
9  understand that if you make a complaint
10 against somebody else that -- that your
11 name can never be used in connection with
12 the investigation?
13 A      That was my -- that was my idea.
14 Q      Do you understand the
15 distinction between confidential and
16 anonymous?
17 A      Are you saying do I understand
18 the difference?
19 Q      Yes.
20 A      Well, I guess I do.
21 Q      Would your definition of
22 confidential be more like anonymous?
23 A      Yes.

Page 40

1  Q      When you were first hired by
2  Wal-Mart, where did you first work?
3  A      Lakeshore.
4  Q      That's the supercenter over
5  there in Wildwood next to the Sam's Club?
6  A      Yes.
7  Q      How long did you work at
8  Lakeshore?
9  A      Four years.
10 Q      What was your first job there?
11 A      Sales associate.
12 Q      What does a sales associate do?
13 A      Customer service, stock shelves.
14 Q      By customer service do you mean
15 wait on customers, answer their questions,
16 help them find the merchandise they're
17 looking for?
18 A      Yes.
19 Q      Stock shelves?
20 A      Yes.
21 Q      Anything else?
22 A      Unload trucks.
23 Q      How long did you work as a sales

Page 41

1  associate?
2  A      Maybe a year, year and a half.
3  Q      Were you trained on Wal-Mart
4  policies when you were first hired?
5  A      No.
6  Q      Did you go through something
7  called orientation?
8  A      Yes.
9  Q      How long did that last?
10 A      Hour, two hours, CBLs, go to the
11 sales floor, come back; hour, two hours,
12 CBLs, go to the sales floor, come back.
13 Basically a day.
14 Q      Let's define what we're talking
15 about.  CBLs is computer-based learning,
16 correct?
17 A      Yes.
18 Q      You get on a terminal and you
19 log in and you go through a computer
20 lesson, correct?
21 A      Yes.
22 Q      And the lessons are on different
23 aspects of your job --

Page 42

1    A      Yes.
2    Q      -- right?  Some of them take a
3    short period of time to complete and others
4    take longer; is that right?
5    A      Yes.
6    Q      But it's pretty much at your own
7    pace?
8    A      Yes.
9    Q      You say that you would spend
10   some time doing CBL and then you would go
11   out on the sales floor and then you would
12   come back and do more CBL?
13   A      Yes.
14   Q      How long did this go on?
15   A      About a day.
16   Q      Approximately how much time did
17   you spend in that orientation day on CBL
18   training?
19   A      I really don't know.  You can
20   only do it for like two hours and it will
21   log you off, and you go to the sales floor
22   and you come back.  CBLs will log you off
23   after two hours.

Page 43

1    Q      You work on the sales floor for
2    a period of time.  Is that also considered
3    part of orientation?
4    A      I imagine that it is.
5    Q      Are you being walked through any
6    of this by a supervisor?
7    A      No.
8    Q      When you were a supervisor in
9    the Vestavia store, did you ever have
10   occasion to oversee the orientation of new
11   associates?
12   A      No.
13   Q      When you started to work at the
14   Lakeshore store, was that about '98, '99?
15   A      It was '98.
16   Q      '98?
17   A      Yes.
18   Q      Did you receive a hard copy of
19   the associate handbook?
20   A      I did.
21   Q      Do you still have that associate
22   handbook?
23   A      I -- you know, I've been looking

Page 44

1    for that.  I know I have it somewhere,
2    maybe in some boxes.
3    Q      You haven't had occasion to go
4    back and review it in -- in some time?  You
5    just don't know where it is?
6    A      Well, actually, I can get that
7    information off the Wire in our company.
8    Q      The Wire is the company
9    Internet, correct?
10   A      Yes.
11   Q      And the -- at some point do you
12   understand that the company stopped issuing
13   hard copies of handbooks and it's all on
14   the Wire now?
15   A      Yeah.
16   Q      What's contained in the Wire?
17   A      I don't know.
18   Q      Or on the Wire?
19   A      I don't know.  A lot of stuff.
20   Q      Do you ever go on yourself and
21   look at -- look at stuff on the Wire?
22   A      Yes.
23   Q      What sort of stuff have you

Page 45

1    reviewed?
2    A      Rules, policies, regulations,
3    compliance issues, a variety of stuff; pay,
4    job positions, career training, a career
5    preference dashboard, stuff like that.
6    Q      And this is all material that
7    previously was published in the handbook?
8    A      Not all of it.
9    Q      Not all of it, right, but some
10   of it was published in the handbook.  And
11   the Wire has you said policies.  All
12   policies are published on the Wire?
13   A      Not all policies, but you can
14   get to policies on -- some of the policies
15   on the Wire.
16   Q      How often do you -- do you get
17   on the Wire and check any of these things
18   you've talked about?
19   A      Since Vestavia quite a bit.
20   Q      Did you do it very often when
21   you were at Vestavia?
22   A      I did.
23   Q      Is it something that you can do

13

Page 46

1  from a remote location or only at the -- at
2  the store itself?
3  A       I don't know how that works.
4  I've only done it at the store.
5  Q       You've only done it at the
6  store. So, you don't know whether you can
7  log on at your home?
8  A       No.
9  Q       So, when you've done it at the
10 store, you understand that you're able to
11 do this while you're on the clock, while
12 you're on company time and review policies,
13 review procedures, I think you said check
14 for job openings?
15 A       Yes.
16 Q       Since you've been at Alabaster,
17 have you bid on any other job openings?
18 A       I have.
19 Q       I'm sorry?
20 A       I have.
21 Q       You have. What have you bid
22 for?
23 A       The same position that I lost.

Page 47

1  Q       How many times have you bid for
2  that job?
3  A       We only do it once. And after a
4  certain amount of time -- from my
5  knowledge, it stays on there a certain
6  amount of time. I don't know for sure.
7  Q       You're talking about the career
8  preference system?
9  A       Yes.
10 Q       So, you're able to -- you're
11 able to get online and update your career
12 preference as often as you want, correct?
13 A       I guess that's how it works.
14 Q       You can indicate in that system
15 every job or position that you're
16 interested in having and if one comes open,
17 your name is already there for management
18 to consider. Is that your understanding of
19 how it works?
20 A       Yeah, if you do it right, but I
21 found out that I did it wrong once and I
22 wasn't -- anyway, yeah.
23 Q       But you've since corrected what

Page 48

1  was -- what you had done wrong?
2  A       Yeah. A member of management
3  told me what I needed to do, what I didn't
4  have knowledge of the first time and he
5  told me what to do. So, it's been sitting
6  in there for a while now.
7  Q       How often have you -- how often
8  have you updated your career preference?
9  A       I've updated it since I've been
10 in Alabaster.
11 Q       Did you ever -- did you ever
12 update it while you were working at
13 Vestavia?
14 A       No.
15 Q       Did you ever update it when you
16 were working at Lakeshore?
17 A       Lakeshore I didn't even know
18 anything about it.
19 Q       It hasn't -- the system hasn't
20 been online for the whole period of time
21 that you've been employed, correct?
22 A       I don't know.
23 Q       You don't know?

Page 49

1  A       (Witness shakes head).
2  Q       When was the first time at
3  Vestavia that you put something into your
4  career preference that was different from
5  the job that you had?
6  A       I didn't put anything in the
7  system at Vestavia.
8  Q       But I think you told me that you
9  had checked that while you were at
10 Vestavia?
11 A       No. Alabaster.
12 Q       Just since you've been at
13 Alabaster?
14 A       Right.
15 Q       Other than the job that you
16 lost, overnight support manager, have
17 you -- have you updated your career
18 preference while at Alabaster with any
19 other job positions?
20 A       No. Just support manager.
21 Q       Do you know whether there have
22 been any support manager openings at
23 Alabaster?

Page 50

```
 1   A       There's two open right now.
 2   Q       Do you know how many people are
 3   being considered?
 4   A       You wouldn't know that.  We
 5   wouldn't know that.
 6   Q       Since you've been at Alabaster
 7   and have updated your career preference to
 8   include overnight support manager, have
 9   there been any openings in that position
10   filled?
11   A       No.
12   Q       How long have the openings been
13   there, if you know, for the overnight
14   support manager in Alabaster?
15   A       Well, I had to wait a year after
16   leaving Vestavia before I could even apply
17   for any position to supervise anyone.
18   Q       That's because you were on a
19   D-Day?
20   A       Yes.
21   Q       What do you understand about the
22   way the coaching -- the progressive
23   coaching system works at Wal-Mart?
```

Page 51

```
 1   A       I understand the chain that it
 2   takes.
 3   Q       The chain?
 4   A       Yeah.  The verbal, written,
 5   D-Day.
 6   Q       I see.  So, by progressive we
 7   mean one step to the next step to the
 8   next.  A verbal is the first step, a
 9   written is the second step and a D-Day is
10   the final step?
11   A       Right.
12   Q       And how long do those coachings
13   stay on your record?
14   A       From my understanding, a year.
15   Each one falls off after a year from what I
16   understand.
17   Q       So, you also understand that as
18   long as you have an active coaching, one
19   that hasn't fallen off yet, you're not
20   allowed to be considered for a promotion or
21   a transfer to any other position or a move
22   to any other position?
23   A       Right.  That's why I applied
```

Page 52

```
 1   after the year was over with after the
 2   coaching fell off.
 3   Q       So, at that point you expected
 4   to be considered for any position that
 5   you've applied for?
 6   A       Yes.
 7   Q       And that would have been
 8   sometime in the earlier part of this year?
 9   A       Yes.
10   Q       What was the last job that you
11   held at Lakeshore before you moved to
12   Vestavia?
13   A       Overnight cashier.
14   Q       How long were you an overnight
15   cashier?
16   A       Maybe a year.
17   Q       Did you work for the front-end
18   manager?  Who was your -- who was your
19   supervisor when you were a cashier?
20   A       There was customer service
21   managers, and I don't remember the names.
22   Q       Did you ever have any complaints
23   about your -- about your job or about your
```

Page 53

```
 1   job duties as an overnight cashier while
 2   you were at Lakeshore?
 3   A       No.  I was -- I was given an
 4   award for a four star cashier having the
 5   highest IPH and operating the front end the
 6   way I was supposed to.
 7   Q       That's items per hour.  That's
 8   your scanning rate?
 9   A       Yes.
10   Q       Did you have occasion to bring
11   any complaints or gripes, if you will, to
12   anybody in management while you were
13   working as an overnight cashier at
14   Lakeshore?
15   A       Not that I can remember.
16   Q       Do you remember whether there
17   were any complaints made by anybody against
18   you while you were at Lakeshore?
19   A       None were brought to my
20   attention.
21   Q       Did you ever make any kind of
22   open door complaint or ethics help line
23   complaint while you were working at
```

Page 54

1   Lakeshore?
2   A       I probably have.  I do believe I
3   have.  I can't remember what they were.
4   Q       Do you remember -- I think I
5   know your answer from the way you answered
6   my last question, but I take it you don't
7   remember who you might have made that
8   complaint about?
9   A       Right.
10  Q       Do you -- would you remember who
11  you might have made that complaint to?
12  A       No.
13  Q       Do you remember what the
14  substance of any such complaint might have
15  been?
16  A       No.
17  Q       Did you have any conflict with
18  anybody while you were working at
19  Lakeshore?
20  A       No.
21  Q       Anybody in management at
22  Lakeshore that you had any complaints
23  about?

Page 55

1   A       Not that I can remember.
2   Q       Any disagreements with?
3   A       Not that I can remember.
4   Q       How did you first learn about a
5   job opportunity at Vestavia?
6   A       My district manager.
7   Q       Who was the district manager
8   that --
9   A       Britt Wood.
10  Q       What did Mr. Wood tell you?
11  A       That he had a job opportunity
12  for me to go to Vestavia and train the
13  overnight associates the Wal-Mart way,
14  teaching them the way we do things at
15  Wal-Mart.
16  Q       Now, was the Vestavia
17  Neighborhood Market opened at the time that
18  Mr. Wood told you this?
19  A       No.
20  Q       It was still being converted
21  from what it had been before --
22  A       Yes.
23  Q       -- correct?

Page 56

1   A       Uh-huh.
2   Q       Was it -- I'm forgetting.
3   A       Winn-Dixie.
4   Q       Winn-Dixie?  The neighborhood
5   market is sort of a new concept for
6   Wal-Mart.  Am I correct?
7   A       Yes.
8   Q       It was being rolled out as sort
9   of a grocery store competitor to stores
10  like Publix and Winn-Dixie and I guess
11  Bruno's was still around at that time,
12  correct?
13  A       Yes.
14  Q       Did you have any further
15  discussions about this with Britt Wood?
16  A       No.  I had just -- I had just
17  completed a setup at the Palisades
18  Neighborhood Market for Britt and Kelly
19  Cooper, our merchandiser, who sent me over
20  there to train those associates and set
21  that store, their frozen food for them.
22  So, I just did that previous to coming to
23  Vestavia.

Page 57

1   Q       Was that -- was that considered
2   a remodel, or was it different?
3   A       Same as Vestavia.  It was a
4   Winn-Dixie turning into a neighborhood
5   market.
6   Q       It was a brand new sort of an
7   opening first time with a Wal-Mart name on
8   it?
9   A       Uh-huh.
10  Q       So, you had just completed doing
11  this at -- at Palisades you said and you
12  said you were training the overnight --
13  A       (Witness shakes head).
14  Q       -- associates at Palisades?
15  A       No, I didn't say that.
16  Q       What were you doing at
17  Palisades?
18  A       I was sent over to the Palisades
19  by the district manager and by Kelly
20  Cooper, the food merchandiser, to train the
21  Palisades associates.  This was during the
22  day to train the associates how to stock
23  the shelves, set the shelves, put the

Page 58

1   merchandise on the shelves, put the
2   merchandise in the receiving area or the
3   freezer area because I was just doing
4   frozen only and show them the correct way
5   to do this type of work in that frozen
6   area.
7   Q        Now, at that time were you still
8   classified as a cashier at Lakeshore?
9   A        No.
10  Q        At the time that you were doing
11  this job at the Palisades?
12  A        No.
13  Q        What was your -- what was your
14  title at the time that you were doing this
15  at the Palisades?
16  A        I was a department manager for
17  frozen foods in the Calera store.
18  Q        Where did you -- when did you
19  first move to Calera?
20  A        '01.
21  Q        2001?
22  A        Uh-huh.
23  Q        That was your first supervisory

Page 59

1   position at Wal-Mart?
2   A        With Wal-Mart, yes.
3   Q        How did you find out about it?
4   A        About --
5   Q        The supervisory position at
6   Calera.
7   A        There was a job opening in
8   frozen foods as department manager, and I
9   was referred to take the position.
10  Q        Did this come through the career
11  preference system?
12  A        No.
13  Q        Who referred you to it?
14  A        Assistant manager Billy Hayes.
15  Q        And he was at Lakeshore?
16  A        He was at -- we're talking about
17  Calera.
18  Q        Well, I mean, who was it -- you
19  were working at Lakeshore as a cashier at
20  the time before you went to Calera,
21  correct?
22  A        No.  You went all the way back
23  to Vestavia, and then you're going back to

Page 60

1   Lakeshore now.
2   Q        I realize I'm skipping around
3   some, but let's talk about you going to
4   Calera first.
5   A        Transferred.
6   Q        You were transferred to Calera
7   from where?
8   A        From Lakeshore.
9   Q        Lakeshore.  At the time that you
10  were working at Lakeshore, your last job
11  there you told me was overnight cashier?
12  A        Right.
13  Q        Were you transferred to Calera
14  as an overnight cashier?
15  A        Stocker.
16  Q        A stocker?
17  A        Stocker.
18  Q        How long did you work as a
19  stocker at Calera?
20  A        Not even a year.  I got
21  overnight employee of the month like three
22  months there and then was referred to go to
23  a department manager by two -- actually two

Page 61

1   managers, Billy Hayes and Stephen Johnson.
2   Q        Was the transfer to the Calera
3   store from Lakeshore something you
4   requested?
5   A        Yes, sir.  We bought a home in
6   Calera.  So, I wanted to be closer to home
7   instead of driving 25 miles into the city.
8   I could just drive five -- five minutes
9   around the corner.
10  Q        I sure understand that.  So, you
11  requested a transfer from Lakeshore to
12  Calera and it was granted?
13  A        Uh-huh.
14  Q        You moved over there, and you
15  worked as a stocker for a period of time
16  and then you were recommended as the
17  overnight manager in frozen food?
18  A        Frozen food manager and it's not
19  overnight.
20  Q        It was not overnight?
21  A        Right.
22  Q        How much of a pay increase did
23  that involve?

(Pages 62 to 65)

Page 62

1    A    I don't know exactly what the
2   pay scale does here from then and now.  But
3   you go to levels.  It's pay levels.  And I
4   believe -- I don't know what the stocker
5   level was.  A two and to go to the
6   department manager is a level six.  So,
7   whatever the pay was in between there is
8   what I got.
9    Q    But it was a pretty significant
10  increase, I gather?
11   A    It was an increase.
12   Q    Now, as the frozen food manager,
13  it was -- you told me you were still paid
14  by the hour, but you had more authority
15  than you had while you were a cashier?
16   A    Right.
17   Q    How many folks did you have
18  working for you?
19   A    It varied.  You know, Wal-Mart
20  has a high turnover of people.  So, it
21  varies.  But I had associates that worked
22  underneath me.
23   Q    On the average how many answered

Page 63

1   to you?
2    A    In the six years that I was a
3   frozen food manager there, in one year's
4   time I never had anybody that really worked
5   a year, two years, you know, with me.  So,
6   they kept coming and going.  And at times
7   it wasn't very many.  One or two.
8    Q    Was it ever more than two?
9    A    I can't remember a time it was
10  ever more than two.
11   Q    You're describing a fairly
12  frequent turnover, but that would be true
13  in the rest of the store as well, wouldn't
14  it?
15   A    I said Wal-Mart as a company.
16   Q    Now, during the time that you
17  were the frozen food manager in Calera, did
18  you have any conflict with anybody that you
19  were working for or who was working for
20  you?
21   A    In Calera?
22   Q    Yes, sir.
23   A    No.  Actually I -- in Calera

Page 64

1   I've actually recommended promotions for
2   associates that worked for me.
3    Q    Did you ever have any occasion
4   to lodge any complaints, any open door
5   complaints, any ethics hotline issues or
6   anything like that?
7    A    I did.
8    Q    Tell me about -- was it more
9   than one?
10   A    Yes.
11   Q    Well, let's start with the first
12  one you can remember.
13   A    I can only -- I can remember
14  one.  It was racial discrimination
15  allegations that I brought to the home
16  office about a manager named Sonny.  I
17  can't remember his last name.  But he was a
18  manager fresh out of the training program.
19  Myself and several other associates, black
20  associates made this complaint.
21   Q    I gather the manager named Sonny
22  was Caucasian?
23   A    Yes.

Page 65

1    Q    And you said he was -- he -- was
2   it a she?
3    A    It was a guy.
4    Q    A guy.  Was just out of the
5   training program?
6    A    Yes.
7    Q    What was the nature of your race
8   discrimination claim against Sonny?
9    A    I don't remember.  I don't
10  remember offhand.
11   Q    How did you make -- how did you
12  bring that complaint forward?
13   A    A statement first to management,
14  I believe, myself and a couple of other
15  associates.  And from there we didn't get
16  any -- any feedback, any reply about it.
17  So, we used the ethics hotline.
18   Q    After you used the ethics
19  hotline, what happened?
20   A    A lot of distance from
21  management.
22   Q    Well, let me ask my question
23  more specifically.  After you used the

Page 66

1   ethics hotline, were you interviewed by
2   anybody in management?
3   A      No.
4   Q      Were any of the other associates
5   interviewed by anybody in management?
6   A      I don't know.
7   Q      You don't know?
8   A      I don't know.
9   Q      Do you know what or whether
10  there was any resolution to the race
11  discrimination allegations you made against
12  Sonny?
13  A      I don't know.
14  Q      Can you remember what
15  specifically you contended was
16  discriminatory about the way Sonny was
17  managing?
18  A      I don't remember exactly what it
19  was.  It was just -- it had a lot to do
20  with the way he would talk and treat the
21  black associates as opposed to Caucasian
22  associates.
23  Q      Can you help me understand what

Page 67

1   you mean by that?
2   A      No, I don't.  But the statement
3   is at Wal-Mart.  It should be still at
4   Wal-Mart what I wrote.  I don't remember
5   it.
6   Q      You gave a written statement to
7   somebody in management?
8   A      I believe I did.
9   Q      Was that the first time that you
10  ever made a hotline or other kind of open
11  door complaint at Wal-Mart alleging race
12  discrimination?
13  A      I don't know.  I don't know.
14  Q      Are you familiar with the
15  harassment and discrimination prevention
16  policy at Wal-Mart?
17  A      I've read something -- read a
18  little bit on it.
19  Q      For shorthand it's sometimes
20  referred to as PD-19.  Are you familiar
21  with that term?
22  A      I didn't know about PD-19 until
23  Vestavia.

Page 68

1   Q      You didn't know about the policy
2   or you --
3   A      I didn't know about PD-19 until
4   Vestavia.  I never heard of it.
5   Q      Are you saying that you did not
6   know that it was called PD-19, or you did
7   not know there was a policy?
8   A      I did not know neither one.
9   Q      You never read it on the Wire or
10  in your associate handbook?
11  A      No, not PD-19.  I didn't know
12  about that until Vestavia.
13  Q      Well, what do you understand
14  Wal-Mart's policy about discrimination and
15  harassment covers?
16  A      I don't understand.
17  Q      When you made your complaint
18  about race discrimination against Sonny,
19  you said you used the ethics hotline,
20  correct?
21  A      I did.
22  Q      You were complaining that there
23  was a violation of Wal-Mart policy,

Page 69

1   correct?
2   A      Right.
3   Q      What do you understand the
4   policy was that was being violated?
5   A      Discrimination between blacks
6   and whites.
7   Q      Do you understand that it covers
8   anything other than race?
9   A      Harassment is what I know a
10  little bit about or read about.
11  Q      How do you understand it defines
12  harassment?
13  A      It doesn't define it.  In
14  general it just says that they don't
15  tolerate harassment is what I read in
16  there.
17  Q      Other than race, what other
18  categories of individuals do you understand
19  the policy covers?
20         MR. WINSTON:  Object to the
21  form.
22  Q      That is, discrimination based
23  upon what other characteristics other than

Page 70

1    race are covered by the policy?
2    A        Religion, gender, age.
3    Q        **Sexual orientation?**
4    A        Sexual orientation.
5    Q        **Disability?**
6    A        I might have read that about
7    disability.
8    Q        **You say you might have read**
9    **that?**
10   A        I might have.  I don't remember.
11   Q        **Even today you can get on the**
12   **Wire and you can read the whole policy,**
13   **correct?**
14   A        Yeah.
15   Q        **I mean, not like sitting here**
16   **right now, but you could -- you could log**
17   **onto the Wire at work and you could read**
18   **what's in the policy?**
19   A        Right.
20   Q        **Have you ever done that?**
21   A        I have.
22   Q        **You have?**
23   A        Uh-huh.

Page 71

1    Q        **Did you do that when you were in**
2    **Vestavia?**
3    A        I did it after I left Vestavia.
4    Q        **You had not done it while you**
5    **were at Vestavia?**
6    A        No, not to my knowledge.  I
7    might have.  Actually, I have.  Yeah,
8    policies about dress codes and stuff like
9    that.  There were issues about dress codes,
10   yeah.
11   Q        **Any other policies you remember**
12   **reading while you were at Vestavia?**
13   A        Not right now I don't remember.
14   Q        **But you say you read those off**
15   **the Wire?**
16   A        That's where I got the
17   information from.
18            MR. HARBUCK:  We've been going a
19   little more than hour.  Do y'all want to
20   take a short break?
21            MR. WINSTON:  That would be
22   great.
23            (A break was taken at 10:58 a.m.

Page 72

1    and the deposition resumed at
2    11:17 a.m.)
3    Q        **(BY MR. HARBUCK:)  Mr. Gilbert,**
4    **when we stopped and took a break, we were**
5    **talking about race discrimination**
6    **complaints that you made while you were**
7    **working in Calera, and you told me about**
8    **the one that you had made against the**
9    **manager named Sonny.  And I don't know --**
10   **were there any -- was there anything that**
11   **we've talked about so far that you want to**
12   **go back and add to or change or modify, as**
13   **far as you know?**
14   A        No.
15   Q        **Have you told me everything that**
16   **you remember about your claims against**
17   **Sonny and the way you said that he talked**
18   **to African-American associates as opposed**
19   **to the way he talked to Caucasians?**
20   A        Yes.
21   Q        **What other race discrimination**
22   **complaints did you raise while you were at**
23   **Calera?**

Page 73

1    A        I don't know if I raised any.
2    Q        **Well, let me go back.  I made a**
3    **note when we were first talking about that**
4    **and I understood -- my note says that you**
5    **said that there was more than one.  And I**
6    **asked you about the first one you remember,**
7    **and that's when you told me about Sonny.**
8    **Do you remember any other race**
9    **discrimination claims that you made at**
10   **Calera?**
11   A        At Calera, no.
12   Q        **Did you make any other kind of**
13   **discrimination claims while you were in**
14   **Calera?  By other discrimination I mean**
15   **based on any other factor like sex or age**
16   **or anything else.**
17   A        Maybe harassment.  Maybe
18   harassment during the time I was department
19   manager.  I called Kevin Lynch's office
20   about something.  I don't even know what it
21   was about.
22   Q        **Who is Kevin Lynch?**
23   A        You know what, I don't know an

Page 74

1  exact title, but let me just shoot it out
2  there.  Maybe regional vice president,
3  something like that or something.
4  Q        Is he in Bentonville?
5  A        I don't know his location.
6  Q        And you had called his office
7  more than once?
8  A        I've called his office once, I
9  believe.
10  Q        Was that about --
11  A        An incident that --
12  Q        About Sonny or about somebody
13  else?
14  A        It was an incident at Calera.  I
15  don't remember what it was, but I'm sure
16  they have it documented somewhere.
17  Q        Well, tell me what you remember
18  about the incident in Calera.
19  A        I don't.
20  Q        Can you remember whether it was
21  an incident that you thought was based upon
22  race or some other factor?
23  A        Some other factor.

Page 75

1  Q        You mentioned retaliation a
2  moment ago.  What do you recall that you
3  believe was retaliatory?
4  A        Any time that you call
5  Bentonville over a store manager's head,
6  district manager's head or something like
7  that, they tend to retaliate against you.
8  I read somewhere in the Wire where they
9  said you're not supposed to.
10  Q        Other than Kevin Lynch, do you
11  recall ever complaining to anybody else at
12  that level of management by which I mean
13  above the -- what used to be called the
14  district and is now called the market level
15  either in human resources or in the
16  operation side?  Other than Kevin Lynch, do
17  you recall anybody else that you ever
18  complained to?
19  A        Yeah.  David Norman.
20  Q        Now, what do you understand
21  David Norman's position to be?
22  A        Someone -- somewhere like
23  Kevin's, I believe.  I don't know exactly

Page 76

1  what it was.
2  Q        Do you know whether he's in
3  Bentonville?
4  A        I don't know where his office
5  is.  Maybe so.  I think so.
6  Q        How would you find the names and
7  contact information --
8  A        In the store.
9  Q        In the store?
10  A        Yeah.
11  Q        Was this information that you
12  had available to you through the -- the
13  hotline open door system?
14  A        Information about David and --
15  Q        About how to contact them.
16  A        It's in our store.  It's posted
17  over our store.  You know, when you have
18  issues -- open door issues, you go -- they
19  have these contact numbers there.
20  Q        And you understand that open
21  door system says that you can take a
22  complaint to any level of management?
23  A        Right, that you feel comfortable

Page 77

1  with.
2  Q        And that it promises
3  non-retaliation?
4  A        That's what my understanding
5  was.
6  Q        And that you can do it on
7  company time, correct?
8  A        Right.
9  Q        You can even be paid if you're
10  doing any of it on your time?  Do you
11  understand that to be --
12  A        I understand that.
13  Q        Now, your statement a moment ago
14  was that any time you called Bentonville or
15  upper management that, quote, they tend to
16  retaliate against you.  Now, my next
17  question and series of questions is going
18  to be who is they and what do you consider
19  to be retaliation?
20  A        There was one guy, Jeremy
21  Crook.  He was the co-manager at Calera
22  before I came to Vestavia.
23  Q        Okay.  Let's not get too fast

Page 78

1  now.  I want to be able to make sure I
2  understand you.
3        Jeremy Crook was in management
4  at Vestavia?
5  A      Uh-huh.
6  Q      What is it about Jeremy that you
7  were about to tell me?
8  A      I had a Bentonville issue.  I
9  had called the home office about some issue
10 at the store.
11 Q      Do you remember what it was?
12 A      I don't remember exactly what it
13 was.  But upon transferring to the Vestavia
14 store, Jeremy Crook called one of the
15 managers over at the Vestavia store and
16 told the manager he needed to watch out for
17 this guy Reggie.  You know, Reggie does a
18 lot of calling the home office.  You know,
19 he said, he's a hothead.  You know, you
20 need to keep an eye on him.
21 Q      Who do you understand Jeremy
22 Crook talked to in Vestavia?
23 A      Harold Kirk Kilpatrick (sic).

Page 79

1  Q      And he told Harold to watch out
2  for you because you tend to make a lot of
3  complaints, you tend to call Bentonville a
4  lot.  Is that what you understand?
5  A      Yes.
6  Q      How did you come by this
7  understanding that Jeremy made that call?
8  A      Kirk told me that Jeremy called
9  him, and Kirk also stated that you need to
10 watch yourself because all eyes are on
11 you.  That comment was also made by the
12 acting store manager, which was a
13 co-manager by the name of Gray.  I don't
14 know his real name.  We just called him
15 Gray.  And Gray also confirmed that by
16 stating to me, yeah, Reggie, all eyes are
17 on you.  You need to watch yourself.
18 You've got to prove yourself.
19 Q      And this was shortly after you
20 transferred to Vestavia?
21 A      Yes.
22 Q      Same question as before.  What
23 other things do you consider to be

Page 80

1  retaliation for having made complaints?  Or
2  was there any other -- were there any other
3  retaliation issues that you contend from
4  the time you were in Calera?
5  A      Not that I can think of.
6  Q      Can you think of any other
7  discrimination issues other than the ones
8  you've told me about from Sonny from the
9  time you were in Calera?
10 A      Not that I can think of in
11 Calera.
12 Q      Was your time in Calera the
13 first time that you experienced anything
14 that you considered to be discrimination or
15 retaliation while you worked at Wal-Mart?
16 A      Including Vestavia?
17 Q      Well, I say the first time.  I
18 mean, you worked in Calera -- you've told
19 me about the incidents in Calera.  Before
20 you went to Calera you worked in Lakeshore.
21        My question is from what you've
22 told me about the discrimination in Calera,
23 was this the first time that you believed

Page 81

1  that you were suffering any kind of
2  unlawful treatment during the whole period
3  that you worked at Wal-Mart?
4        MR. WINSTON:  Object to the
5  form.
6  Q      Would you like me to rephrase
7  it?
8  A      Yeah.
9  Q      Was your complaint against Sonny
10 in Calera the first time that you believed
11 you were being discriminated against while
12 you worked at Wal-Mart?
13 A      No, not while I worked at
14 Wal-Mart because I'm still with Wal-Mart.
15 I have complaints about Vestavia.
16 Q      I said the first time.  Prior to
17 your complaint against Sonny, did you ever
18 have any complaints about Wal-Mart that you
19 considered to involve discrimination?
20 A      Not that I know of.  Maybe in
21 Lakeshore, but not that -- I don't know.  I
22 don't remember.
23 Q      Prior to Jeremy Crook calling



Page 82

1  Harold Kilpatrick -- or Kirkpatrick, is
2  there anything in your treatment that you
3  believe was retaliatory by anyone in
4  management at Wal-Mart?
5  A        Before the call, before Jeremy's
6  call?
7  Q        Correct.
8  A        I don't -- I don't know.  I
9  don't understand.  I don't understand.
10  Q        What was the first retaliation
11  that you believe you suffered in the whole
12  time you worked at Wal-Mart?
13  A        It probably had something to do
14  with a co-manager by the name of Kenny
15  Hinds at Lakeshore I think around 2000.
16  '99, 2000, something like that.
17  Q        What did Kenny Hinds do to you?
18  A        I don't remember offhand.
19  There's a statement somewhere there at the
20  company.
21  Q        What did you -- what do you
22  think provoked Kenny Hinds to retaliate
23  against you?

Page 83

1  A        Because I used the -- I used the
2  open door and I called -- at that time the
3  regional personnel manager's name was Chad
4  Nora.  And I had an incident with Chad Nora
5  and the district manager David Johnson.
6  And that was back in Lakeshore, and
7  something happened back then that had to do
8  with my pay and something that had to do
9  with -- yeah, it was actually my pay and
10  my -- what do you call it?  Evaluation.
11  Q        You believed you were being
12  unfairly or discriminatorily paid?
13  A        Yeah.  I never got my
14  evaluation.  It was never -- it was never
15  done.  I never got my pay increase until I
16  called David Norman's office and reported
17  that my evaluation was reported done and it
18  never was done.
19          So, they came and had a meeting
20  with me at Lakeshore.  We sat down, Chad
21  Nora, David Johnson and we got to the
22  bottom of the situation, which was the
23  store manager had the personnel manager

Page 84

1  confirm evals that was never done.  Mine
2  was one of them.
3  Q        So, it wasn't just yours.  It
4  was more than one?
5  A        To my knowledge.  I was just
6  interested in mine, but yeah, I think they
7  found out it was more than one.
8  Q        Was there any disciplinary
9  action taken against that manager?
10  MR. WINSTON:  Object to the
11  form.
12  Q        If you know.
13  A        I don't -- I don't know.  I
14  mean --
15  Q        And you tell me -- you told me
16  that you don't really recall what it was
17  that you believe was done to retaliate
18  against you after you made that complaint?
19  A        Just the treatment I was getting
20  from management and stuff.
21  Q        Can you -- can you be more
22  specific?
23  A        Kind of bird-dogging me.  You

Page 85

1  know what I'm saying?  Kind of critiquing
2  my every move.  You know, stuff like that
3  that they didn't do before that happened,
4  that call.
5  Q        By bird-dogging do you mean
6  additional scrutiny?  Is that what
7  you're -- is that what you mean by that
8  term?
9  A        Or harassing me.  Just harassing
10  me for everything I was doing or wasn't
11  doing, you know, where they wasn't doing
12  that before I made the call.
13  Q        Now, that was at Lakeshore.  And
14  you told me about this Lakeshore
15  information in response to my question of
16  what was the first time that you believe
17  that you were being discriminated against
18  or retaliated against during the time you
19  worked at Wal-Mart.
20          I would like to move forward
21  again to Calera.  You've told me about
22  your -- your incident at Calera that you
23  complained to Kevin Lynch about, and you

Page 86

1 said that in response to that Jeremy Crook
2 called Kirkpatrick and warned him when you
3 transferred to Vestavia.  Did I summarize
4 that accurately?
5 A      Yeah.  The call from Jeremy
6 Crook didn't actually -- wasn't about the
7 phone call to David -- to -- what's his
8 name?  Kevin Lynch.  It was based on the
9 information given to Jerry (sic) from other
10 members of management that this is the type
11 of guy Reggie is.
12 Q      When you say Jerry, do you mean
13 Jeremy?
14 A      Jeremy.
15 Q      Jeremy.  Anything else that
16 happened to you while you were at Calera
17 that you consider to be retaliatory?
18 A      Not that I can think of right
19 now other than what I've told you already.
20 Q      Other than what you've told me.
21      Let's go back to the testimony
22 you gave that while you were still assigned
23 to Calera you went over to the Palisades

Page 87

1 Neighborhood Market and you trained the
2 frozen food associates.  Remember that
3 testimony?
4 A      I do.
5 Q      Did you consider that -- that
6 period working at the neighborhood market
7 to be a positive for you and your career at
8 Wal-Mart?
9 A      I did.
10 Q      How did you come to be assigned
11 to do that work?
12 A      My outstanding performance at
13 Calera.
14 Q      Well, let me rephrase my
15 question.  Did somebody in management at
16 Calera recommend you for that job?
17 A      No.  The district manager did
18 and the food merchandiser Kelly Cooper did.
19 Q      Who was the district manager?
20 A      Britt Wood.
21 Q      How long a period of time was
22 this assignment to the Palisades
23 Neighborhood Market?

Page 88

1 A      Well, they had a month to open.
2 So, they needed that department done within
3 a month for the -- to get ready for grand
4 opening.  I did it in two weeks.
5 Q      How many hours per week did you
6 work at that?
7 A      40.
8 Q      40?
9 A      40.
10 Q      And it was after that that you
11 say that you were told that you might have
12 an opportunity to go to the neighborhood
13 market that was going to open up in
14 Vestavia, correct?
15 A      Yes.
16 Q      Was it Britt Wood who told you
17 that?
18 A      Yeah, Britt Wood told me that I
19 had a position in Vestavia.  He had a
20 position for me in Vestavia, an
21 opportunity.  There was a position he had
22 for me.  He wanted me to do the same thing
23 I did in Lakeshore, Palisades over there

Page 89

1 with the new associates in Vestavia, which
2 by the way were all new associates.  No one
3 ever worked for Wal-Mart before.
4 Q      At the time that you had this
5 conversation with Britt Wood, did you
6 understand that this would be a permanent
7 assignment for you at Vestavia?
8 A      Yes.
9 Q      So, it wouldn't be just a
10 training opportunity for temporary -- for a
11 temporary period.  It would be a transfer
12 to Vestavia and you would get a manager
13 position out of it, correct?
14 A      Yes.
15 Q      So, you considered -- did you
16 consider that to be a positive step for
17 your career at Wal-Mart?
18 A      Very positive step.
19 Q      So, notwithstanding the
20 complaints that you had made while you were
21 at Lakeshore and that you made at Calera,
22 you were still getting positive
23 recommendations and career opportunities,



Page 90

1 correct?
2 A From the DM, yes.
3 Q When did you first start to work
4 at the Vestavia Neighborhood Market?
5 A I can't remember exactly when it
6 was because I went on vacation a week
7 before I transferred over there, and I want
8 to say June maybe.
9 Q Of '07?
10 A Yes.
11 Q Were you -- when you started in
12 June '07, was your title overnight manager?
13 A Overnight support manager.
14 Q Support manager. So, even
15 though the store wasn't open yet and the
16 associates were still being trained, you
17 had the title of support manager from the
18 very beginning?
19 A Yes.
20 Q How much of a pay increase did
21 that represent?
22 A 12,000 a year.
23 Q So, it was a pretty significant

Page 91

1 bump up?
2 A It was great. It was great.
3 Q And again, so that I'm clear,
4 your position back in Calera had been a
5 frozen food manager?
6 A Right.
7 Q Did the position of overnight
8 support manager carry more responsibility
9 or authority than your position as frozen
10 food manager?
11 A Yes.
12 Q More associates to supervise?
13 A Yes.
14 Q Was it a larger volume of
15 merchandise you were handling?
16 A No.
17 Q The same volume?
18 A No.
19 Q No?
20 A Way less.
21 Q A smaller volume than you had --
22 A In the supercenter or just my
23 department myself?

Page 92

1 Q What you were responsible for.
2 A Yeah. My department was just a
3 two million dollar a year thing I did. But
4 this was a grocery store. So, more, yeah,
5 in Vestavia.
6 Q That's what I'm talking about.
7 I realize that the neighborhood markets are
8 much smaller stores. My question, to make
9 sure that we understand one another, is
10 that what you personally were responsible
11 for at the neighborhood market was a much
12 larger -- much larger volume than what you
13 had been responsible for in Calera?
14 A Correct.
15 Q How long a period of time was it
16 from when you started in Vestavia until the
17 neighborhood market actually opened up?
18 A Doing the setup? I don't even
19 remember when grand opening was, the day it
20 was of grand opening. I don't know. From
21 the time -- the time I got there until
22 grand opening I don't know how long that
23 was.

Page 93

1 Q Well, best estimate will do.
2 Was it a matter of weeks or a matter of
3 months?
4 A Months.
5 Q When you first started there,
6 were they still doing the build-out?
7 A No.
8 Q The build-out had been
9 completed?
10 A Yes.
11 Q Had the associates been hired,
12 or did you have to hire them?
13 A They were hired.
14 Q They were already on the
15 payroll?
16 A Yes.
17 Q Had they been through
18 orientation yet?
19 A I imagine so. I wasn't there.
20 Q You were not involved with
21 that?
22 A I wasn't involved in that, no.
23 Q When you stepped up to the

Page 94

1    overnight support manager, did you receive
2    any kind of reorientation, if you will?
3    A       No -- well, yes.  I had a lot
4    more CBLs to do.  The support manager
5    position came with a lot more CBLs.
6    Q       Do you believe that your
7    experience in the frozen -- as a frozen
8    food manager at Calera, though, had
9    prepared you well for stepping up to
10   support manager?
11   A       Well, yes, because in Calera not
12   only did I do frozen food, but I also did
13   general groceries also.
14   Q       So, you had some background in
15   this already?
16   A       Yes, from store to store.
17   Actually, it was the whole supercenter.
18   I've worked all over it.
19   Q       What was the additional
20   training, the additional CBLs that you did
21   in Vestavia?  What were they focused on?
22   A       Various operations in the
23   store.  Some of them didn't even pertain to

Page 95

1    me like guns and stuffs like that; you
2    know, firearms and stuff like that.  We
3    didn't even sell firearms in the
4    neighborhood market.  I had to do CBLs on
5    firearms and stuff like that.  You know, a
6    lot of stuff didn't even pertain to the
7    neighborhood market, but it came with the
8    support manager's position.
9    Q       That would give you the training
10   and background to be a support manager at
11   supercenters --
12   A       Exactly.
13   Q       -- if you had that opportunity
14   and wanted to do it?
15   A       Uh-huh.
16   Q       Anything else that you did to
17   train or orient or otherwise prepare for
18   your support manager duties when the
19   neighborhood market actually opened up?
20   A       There was no training.  They
21   sent me to a -- they sent me to -- what
22   store was this?
23   Q       Well, before you say that, let

Page 96

1    me -- do you not -- do you not consider the
2    CBL to be training?
3    A       Me honestly, no.
4    Q       Fine.  You were about to say
5    that they sent you somewhere.
6    A       Yeah.  They sent me to a store
7    to get some cash office training, and that
8    was -- I think it was Highway 280 for a
9    week to get some cash hour -- cash office
10   training and Highway 150 Hoover to get some
11   cash office training.  That was about it.
12   Q       And these were supercenters?
13   A       Yes.
14   Q       When you started at Vestavia,
15   was Mr. Chandler here already the manager?
16   A       Yeah, he was the manager, but he
17   wasn't working there.  He was out on
18   medical leave.
19   Q       Back surgery do you understand?
20   A       Medical leave.  That's all I
21   know.
22   Q       Mr. Kirkpatrick was already
23   there, though?

Page 97

1    A       Yes.
2    Q       Did you ever have occasion to
3    work days while you were at Vestavia?
4    A       No.
5    Q       You were only nights?
6    A       That I can remember.  You know,
7    I don't know.  But when I first came --
8    when I first got there, there was a couple
9    of times I was there in the daytime with
10   Kirk and we were training some associates
11   on how to work electrical equipment, like
12   forklifts, scissor lifts -- yeah, forklifts
13   type stuff.  I do remember doing that maybe
14   once or twice during the daytime, I think.
15   I don't remember exactly.
16   Q       Were you also training any of
17   the -- any of the stockers or maintenance
18   folks for the day shift, or were you just
19   training and doing the orientation -- the
20   training for your associates for nights?
21   A       For nights, I believe.
22   Q       When y'all were doing the
23   build-out -- or rather the startup between

26

Page 98

1  the time you got to Vestavia and the time
2  you -- the store actually opened, were you
3  working nights then?
4  A      Well, the build-up and the
5  build-out, that was all done before I got
6  there.  When I got there, there was
7  actually merchandise on the shelves and
8  merchandise in the back and we were
9  receiving trucks.
10  Q      Right.  You said that.  I used
11  the term poorly.  When y'all were getting
12  the store up and running before the
13  opening, y'all were working 24/7?
14  A      Yes.
15  Q      And you were working nights
16  mostly, not very much days?
17  A      I believe so.  I believe it was
18  nights.
19  Q      Who did you mostly answer to?
20  Who was your first level supervisor?
21  A      Kirk -- Kirk Kilpatrick (sic),
22  Tina and Myram.
23  Q      Now, Kirk Kirkpatrick is -- you

Page 99

1  said was assistant manager?
2  A      Uh-huh.
3  Q      And Mr. Chandler was the
4  manager.  Do you remember Tina's last name?
5  A      No.
6  Q      What was her title?
7  A      Assistant manager.
8  Q      And Myron?
9  A      Myram.
10  Q      What was Myram's last name?
11  A      Assistant -- I don't know.
12  Q      Also an assistant manager?
13  A      Yes.
14  Q      Did either Kirk or Tina or Myram
15  mostly work nights over you, or did they
16  mostly work days?
17  A      They all worked days.
18  Q      Did anybody ever work nights
19  when you were there?
20  A      Just myself and the other
21  support manager.
22  Q      And that would have been
23  Mr. Olsen?

Page 100

1  A      Yes.
2  Q      So, during most of your night
3  shift you did not have any supervision
4  above you?
5  A      No.
6  Q      Was the -- was the neighborhood
7  market open on the third shift for
8  business?
9  A      Yes.
10  Q      So, you were -- you and Olsen
11  were the senior levels of supervision there
12  in the store while the store was open at
13  night?
14  A      The only level.
15  Q      Right.  Well, there was --
16  everybody there in the store at night on
17  the third shift was working under you two?
18  A      Right.
19  Q      Nobody was working over you two?
20  A      No.
21  Q      That's what I needed to clarify.
22       MR. HARBUCK:  Can we break for
23  lunch?

Page 101

1       MR. WINSTON:  You're in charge.
2  So, yes.
3       MR. HARBUCK:  Thank you.
4       (A break was taken at 11:47 a.m.
5       and the deposition resumed at
6       1:16 p.m.)
7  Q      (BY MR. HARBUCK:)  Mr. Gilbert,
8  when we broke for lunch, we were talking
9  about you had just started at the Vestavia
10  Neighborhood Market and we were at the
11  point where the neighborhood market opened.
12       Now, at the point that we broke,
13  is there anything that we talked about that
14  looking back on it now you would like to
15  add to, change or otherwise supplement?
16  A      No.
17  Q      No?
18  A      No.
19  Q      Now, we are in this lawsuit
20  because there was a complaint made against
21  you by Eric Olsen and an investigation that
22  followed from that.
23       Before we talk about that

Page 102

1  complaint and that investigation, I want
2  you to tell me how you and Mr. Olsen and
3  your job duties were divided. You
4  testified just before we left that when
5  y'all were there on nights there was nobody
6  up above you in the third shift. So,
7  everybody in the store was subordinate to
8  the two of you. Did the two of you work
9  the same shift on the same night?
10  A      A few nights. Very few nights
11  we did. When we first started -- when we
12  first started the store, we were working
13  four days on, three days off. So,
14  therefore, we only worked together on a
15  Wednesday night.
16  Q      So, the other three days you
17  were on he was not there and the other
18  three days that he was on you were not
19  there?
20  A      Right.
21  Q      So, y'all were just with one
22  another on one night. But my question is
23  when y'all were together, when y'all were

Page 103

1  both there on that Wednesday night, how
2  were the job responsibilities divided
3  between you?
4  A      They were divided between us
5  from the manager who left the notes for us
6  to do, whoever -- whoever left the notes
7  that night.
8  Q      So, that would be not just
9  Mr. Chandler but any of the other managers
10  or assistant managers?
11  A      Yes.
12  Q      So, the notes were left by
13  whoever the manager was for what had to be
14  accomplished that night?
15  A      Right.
16  Q      Were the notes specific as to
17  what you and your crew were to accomplish
18  and to what Mr. Olsen and his crew were to
19  accomplish?
20  A      It wasn't separated by crews.
21  Q      So, it was simply Eric and
22  Reggie, this is what needs to be done
23  tonight?

Page 104

1  A      Yeah, some -- sometimes it was.
2  Sometimes there were specific notes for
3  Reggie and specific notes for Eric.
4  Q      Now, did you have a problem, you
5  yourself have a problem with how Mr. Olsen
6  did his job?
7  A      I did.
8  Q      Tell us what that was.
9  A      Eric wouldn't follow company
10  rules, policies and regulations. He pretty
11  much wanted to do things his way.
12  Q      Can you be specific?
13  A      For instance, the store had went
14  to the process of separating the freight in
15  the back room instead of pulling the
16  freight out to the sales floor, separating
17  the freight out on the sales floor. This
18  came down from corporate office. It wasn't
19  something that a manager did. It was a
20  corporate decision.
21       And when I implemented that --
22  needless to say, I never got trained on it,
23  you know. None of the managers trained me

Page 105

1  on it. None of the managers even told me
2  about it. I got this information from
3  another manager from the 150 store who
4  happened to be a friend of mine.
5       So, I got the information from
6  him. He printed it for me and gave it to
7  me, and I read it so I could see how this
8  is supposed to be done. This was on a
9  night that Eric wasn't even working.
10       So, when he came back to work,
11  you know, I communicated to him this is the
12  new policy and he didn't like it. He
13  didn't like it. He didn't want to do it
14  that way. You know, and then neither did
15  our associates. Our associates didn't like
16  it and didn't want to do it that way, and
17  they made the comment that I'm making up
18  things. I'm changing things. But it was
19  company policy that we had to do it this
20  way.
21  Q      That is a complaint that you've
22  articulated about how Mr. Olsen was doing
23  his job. Did you have any other complaints

**Page 106**

1  about how Mr. Olsen did his job?
2  A       Yes. I also had a situation
3  with Eric and his participation with the
4  associates not work related. You know,
5  kind of like, you know, personal type of
6  things that he would do with associates
7  like breaking with the associates when
8  we -- you know, we normally don't break --
9  management don't normally break with the
10 associates. You take your breaks, you
11 know, with the manager or with yourself or
12 something like that.
13        But he would break with
14 associates or they would be prolonged.
15 They would be too long. 15 minutes is 15
16 minutes. You know, stuff like that.
17        And they would smoke out in
18 front of the store, and we had been
19 repeatedly told not to smoke in the store
20 by the store manager because he got tired
21 of coming in and seeing cigarette butts in
22 front of the store. You know, I would
23 bring that to his attention. Hey, look,

**Page 107**

1  you might not want to smoke out in front of
2  the store. Mike don't want cigarette butts
3  in front of the store. You know, he done
4  said that. You know, but he -- you know,
5  he -- anything I had to say he didn't want
6  to hear it.
7  Q       Did you ever have any
8  confrontation with Mr. Olsen in -- on one
9  of the nights when y'all were working
10 together?
11 A       I did.
12 Q       What happened?
13 A       There was an issue where the
14 district manager -- right before a store
15 opened the district manager came in and he
16 does this thing where he tours the store,
17 and he leaves this -- these documents or
18 notes called tour notes. You know, things
19 to get fixed, things that we need to do to
20 get ready for grand opening.
21        A lot of those notes were
22 sectioned off to different managers: Kirk,
23 Tina, Myram, Mike, Tina, myself and Eric.

**Page 108**

1  Notes -- one particular note that I read
2  that pertained actually to me was the night
3  shift naturally. And it said to have
4  associates be in dress code. All
5  associates need to be in dress code.
6        Well, dress code consisted of
7  beige pants, green shirts. Right? And all
8  our night shift were wearing jeans and, you
9  know, saggy pants, you know, to where you
10 actually -- you know, you actually can see
11 private parts on some of these guys when
12 they're working.
13        Well, Eric didn't like the fact
14 that he had to go to the beige -- to wear
15 the beige pants. He was comfortable with
16 the jeans. And I gave him -- I printed
17 this policy out for everybody. And when
18 Eric came in, I gave Eric -- because he
19 wasn't there that night when I read the
20 tour notes. I said, look, Eric, we've got
21 some notes here and we've got to get all
22 the associates in dress code. So, here's
23 the dress code here.

**Page 109**

1        So, when he read it, he
2  started -- you couldn't wear jeans, the
3  first thing he said was Kirk said we could
4  wear jeans. I said, okay. Well, just --
5  the manager just left these notes. I'm
6  just letting you know now these are notes
7  left by the district manager. This is what
8  he wants us to do. So, I'm just going to
9  pass you this, and I'm going to give one of
10 these to each associate when they come in
11 tonight so everybody will be on the same
12 page.
13        Well, he got heated about that,
14 you know. You're coming in here trying to
15 change something. You know, I already
16 talked to Kirk. Kirk said it's okay. I
17 said, okay. You know, that's fine. You
18 can talk to Kirk, talk to Mike, whatever,
19 but this is what Britt Wood wants.
20        So, therefore, he -- needless to
21 say, he was -- you know, he -- he went to
22 talk to somebody about it I guess later.
23 Q       Was this the night that you

Page 110

1 found Faith Gaines wearing a green shirt
2 that was the wrong shade?
3 A        This was after I gave Faith
4 Gaines and every other associate -- not
5 only Faith, but every associate that worked
6 that shift the printout for dress code.
7 Q        But that was the same night?
8 A        That was not the same night.
9 This was within that week, though.
10 Q        You had a confrontation with
11 Eric Olsen that resulted in what some have
12 described I believe as a shouting match.
13 Did you then later have a conversation with
14 Mr. Chandler about that?
15 A        I don't recall having a shouting
16 match with anyone in that store.
17 Q        Do you remember having a
18 conversation with Mr. Chandler about the
19 confrontation, however you call it, with
20 Mr. Olsen?
21 A        No.
22 Q        What other conflict did you have
23 with Mr. Olsen in the store?

Page 111

1 A        The -- there was an issue of two
2 black associates.  One's name was Ramone
3 and the other one's name was Quincy.  And
4 they came to me trying to use the open door
5 policy on a complaint that they had against
6 Eric, which they said that Eric used
7 profanity to them on the sales floor and
8 they didn't appreciate it.  So, they wanted
9 to make a complaint about it.
10 So, I asked them what happened.
11 They said Eric walked up to them and said,
12 look, you guys -- I've been watching you
13 guys standing here bullshitting around for
14 the last 30 minutes.  You need to get this
15 shit done, you know, like that.
16 So, they came to me and they --
17 and they told me about it.  I said, well,
18 you know, man, there's nothing I can do
19 about it, man, because Eric and I are on
20 the same -- on the same job level.  I said,
21 but this is an issue that you have to take
22 up with Kirk.
23 So, what you might need to do is

Page 112

1 go ahead and write a statement about it.
2 Right?  And I also told them to make a
3 copy.  I said, write the statement, make a
4 copy of the statement and give me -- give
5 me the statement, I'll give it to Kirk.
6 So, when I gave -- I gave the
7 statement to Kirk and who -- I think I gave
8 it to Kirk.  I gave it to a member of
9 management.  I think it was Kirk, though,
10 but I'm not sure.
11 But anyway -- anyway, they
12 talked to Eric about the situation and told
13 Eric that I brought the statement in.  Eric
14 came right out of that meeting, walked out
15 to the sales floor, walked up to me and
16 said, man, what -- you know, what kind of
17 bullshit is this?  You know what I'm
18 saying?  You took a statement in against
19 me, man?
20 I'm like, look, Eric, it was an
21 open door issue.  I couldn't come talk to
22 you about it because it's open door.  It's
23 confidential.  I said, so I took it to the

Page 113

1 management team and let the -- to the
2 management and let them do what they have to
3 do with it.
4 And he said, oh.  So, it's like
5 that?  We're supposed to be watching each
6 other's back.  I said, no.  I'm not watching
7 nobody's back, you know.  I said, this is a
8 policy that I was supposed to do.  This is
9 what I did.
10 So, that's when he said a few
11 cuss words and okay, okay.  I see how it
12 is.  All right.  I'll get you back for that.
13 Q        Did you ever use profanity with
14 your associates in the workplace?
15 A        No, I didn't, but I've heard
16 several and I've always -- I always
17 complained and made comments and reports to
18 Kirk, Tina and Myram about the profanities
19 being used on the night shift.
20 Q        Have you ever had any criticism
21 that you were overly harsh with your
22 associates?
23 A        No one ever told me I was.

Page 114

1        (Defendant's Exhibit No. 1
2        was marked for identification.)
3     Q      Let me ask you to look at what I
4   have marked as Exhibit Number 1 to your
5   deposition.  That's a review -- associate
6   evaluation on you that goes back to 1998.
7   You got performance reviews every year,
8   correct?
9     A      I did.
10    Q      And this was just back when you
11  were a rank in file guy, correct?
12    A      Actually, it's right when I
13  started.
14        (Defendant's Exhibit No. 2
15        was marked for identification.)
16    Q      Let's look at one I will mark as
17  Exhibit 2.  This was your annual review in
18  1999.
19    A      Yeah, '99 is on here.
20    Q      Look at page two, areas of
21  improvement noted.  "Communication with
22  fellow associates needs improvement."  Do
23  you see that?

Page 115

1     A      I do.
2     Q      That was when you were working
3   all the way back in Wildwood, correct?
4     A      Yes.
5     Q      The Homewood store?
6     A      Yes.
7     Q      Look back on the first page.
8   Down at the bottom under communication, "He
9   does need improvement in his communication
10  with fellow associates."  Do you see where I
11  read that?
12    A      Okay.
13    Q      And then it also reads, "Also
14  remember to keep your calm at all time, goes
15  back to respect for the individual."
16    A      Okay.
17    Q      What was the criticism that
18  the -- that your reviewer was making, or
19  what do you understand the criticism was in
20  the way you were dealing with other
21  associates?
22    A      I don't.  I don't know.
23    Q      You don't know?

Page 116

1     A      Huh-uh.
2     Q      Look up at the top, respect for
3   the individual.  Second sentence, "He does
4   need to improve in the ways in which he
5   deals with problems and co-workers."  Do you
6   know what that comment was about?
7     A      No, I don't.
8     Q      You had an opportunity to write
9   comments on this review, correct?
10    A      Yeah.
11    Q      What comments did you write?
12    A      Getting to a management team and
13  getting some Telxon training.
14    Q      Nothing about not understanding
15  what was being told to you about your
16  problem with other associates?
17    A      No, because I didn't feel like I
18  had one.
19    Q      You didn't agree with it?
20    A      I didn't.
21    Q      But you acknowledged that that
22  was in that review?
23    A      Yeah.  They put it in there.

Page 117

1     Q      Back in '99?
2     A      Right.
3     Q      Back in a period you said you
4   were having no problems and no complaints
5   about your employment?
6     A      Right.
7        (Defendant's Exhibit No. 3
8        was marked for identification.)
9     Q      Look at the one I'm marking as
10  Exhibit 3.  This is a review written upon
11  you from '01 to '02, an appraisal while you
12  were still at the Wildwood location,
13  correct?
14    A      Yes.
15    Q      Look at areas for improvement.
16  "Performance is great but needs to improve
17  on personal issues with other associates in
18  the store."  Do you know what that was
19  about?
20    A      I sure don't.
21    Q      You don't?
22    A      Huh-uh.
23    Q      Did you ask?

Page 118

1    A      No, I didn't.
2    Q      Did you comment in the associate
3    comment section?
4    A      I don't know.  Let me see.
5    Q      I think it's on the front page.
6    A      No comment.
7    Q      No comment.
8           (Defendant's Exhibit No. 4
9           was marked for identification.)
10   Q      I'm marking as Exhibit 4 the
11   performance appraisal from 2003 to 2004.
12   This was while you were still in Wildwood?
13   A      What was that now?
14   Q      My question was this review that
15   I've marked as the appraisal that's Exhibit
16   Number 4, was this done while you were still
17   at Wildwood?
18   A      This has Grace's signature on
19   here and Sarah's.  Well, was Grace at
20   Wildwood?  3271, that's -- that's Calera.
21   Q      That's Calera.  Areas for
22   improvement, the last item, it reads,
23   "Continue to grow with company by working

Page 119

1    through people issues."  Do you know what
2    that comment meant?
3    A      No.
4    Q      Do you understand it to mean that
5    the appraiser believed that you had problems
6    with dealing with people?  That was a
7    question.
8    A      That was a question?
9    Q      Yes.
10   A      And it was what?
11   Q      Do you understand that to mean
12   that at least in the appraiser's view you
13   had problems dealing with people?
14   A      I mean, is that their view?  Is
15   that what you're saying?
16   Q      Do you understand that -- that
17   that's what the appraiser was saying?
18   A      Because this seems to be going on
19   like every eval.  This is what they pick off
20   of every eval because they -- this is what
21   they do at Wal-Mart.  They pick that off of
22   every eval.  I've noticed that every eval I
23   got.  I've got these same evals.  And I

Page 120

1    noticed they put it on every one.
2    Q      Well, not every one.
3    A      There's quite a few.
4    Q      I do notice that there is quite a
5    few.  I would agree with that, that there
6    seems to be a pattern in your performance
7    appraisals of different managers in
8    different locations all seeing the same
9    problem with you in dealing with people.
10          And my question is without regard
11   to whether you agree with it or not -- and I
12   heard you say that you don't think it's
13   accurate.  But do you agree that at least as
14   your manager saw it it was a problem?
15   A      No, I don't.
16   Q      You do not agree?
17   A      No, I don't.
18   Q      So, even though these were
19   different managers in different store
20   locations and different years, you believe
21   that each one of them was wrong in their
22   observation about your problem dealing with
23   people?

Page 121

1           MR. WINSTON:  Object to the
2    form.
3    Q      You can answer.
4    A      I don't agree with them.
5           (Defendant's Exhibit No. 5
6           was marked for identification.)
7    Q      Here is Exhibit Number 5.  This
8    is your performance evaluation given in
9    2005.  Was this also in Calera?
10   A      Yes.
11   Q      Do you know who prepared this?
12   A      It looks like Marques Crenshaw.
13   Q      That's a different manager from
14   the one who prepared the one in 2004,
15   correct?  That was William -- Exhibit Number
16   4, do you have that in front of you?
17   A      Yeah, Sarah.
18   Q      Sarah Pogue and William somebody,
19   hourly supervisor.
20          Anyway, Marques Crenshaw was a
21   different manager and his comment in the
22   areas of improvement is, "Finally, Reginald
23   needs to continue to grow with the company

Page 122

1    by working through people issues."  That's
2    what Marques wrote, correct?
3    A      Yes.
4    Q      And you don't agree with that?
5    A      No.
6    Q      At any point did you -- did you
7    ask about what your managers meant when they
8    told you that you had problems or that you
9    had people issues?
10         MR. WINSTON:  Object to the
11   form.
12   Q      That you needed to work through
13   people issues?
14   A      No, I didn't ask.
15   Q      You certainly didn't write any
16   comments in the associate comments/goal
17   settings block?
18   A      I didn't.
19   Q      Is that just because you
20   disagreed?
21   A      Yes.
22         (Defendant's Exhibit No. 6
23         was marked for identification.)

Page 123

1    Q      I believe what I'm handing you,
2    Exhibit 6, Mr. Gilbert, is your current
3    performance appraisal.  It's dated 4/16/09.
4    That's your signature.  Did you write that
5    date on it?
6    A      What do you mean?  Next to my
7    signature?
8    Q      Yes, sir.
9    A      Yeah.
10   Q      That was the date that you signed
11   it?
12   A      Yeah.
13   Q      So, this is your current annual
14   performance appraisal?
15   A      Yeah.
16   Q      And this reads in areas of
17   improvement "Reginald's areas for
18   improvement are he needs to learn to get
19   along better with all associates, stay out
20   of other people's affairs and let management
21   handle the store."  Do you know who -- who
22   wrote that --
23   A      Yeah, Turi Cason.

Page 124

1    Q      -- comment?
2    A      Turi Cason, co-manager.
3    Q      Turi Cason did?
4    A      Uh-huh.
5    Q      Did you ask Turi what was meant
6    by that comment?
7    A      No.  No, I didn't.
8    Q      Did you ask anybody else?
9    A      No.
10   Q      Do you have an understanding of
11   what it means?
12   A      No.
13   Q      I gather you disagree with it?
14   A      I do.
15   Q      Why did you not write any
16   comments over in the associate comments
17   section?
18   A      Because nothing ever gets done
19   about it.  So, I don't.
20   Q      Well, I didn't see that you did
21   in even the very first ones where that
22   comment was made, where that observation was
23   made.  So, we know -- I believe you have

Page 125

1    testified that on a number of occasions you
2    have made complaints at Wal-Mart about
3    things that you disagree with, but your
4    testimony here today is that even though you
5    disagreed with this consistent critique of
6    your dealings with associates that you
7    never -- that you never complained or raised
8    any issue about it.  Is that what I'm
9    understanding you to say?
10   A      Yes, sir.
11   Q      How did you first come to learn
12   that a discrimination complaint had been
13   made against you?
14   A      When did that -- I was called to
15   the office.  I was called to the office
16   about it.  I don't remember the date, what
17   day it was.
18   Q      What did you learn?
19   A      I learned that it was alleged
20   that I made a discriminatory remark about an
21   associate.
22   Q      Did you learn who alleged it?
23   A      No, they never told me who said

Page 126

1   it. They said that it was brought -- an
2   associate told Eric Olsen and Eric Olsen in
3   turn went to management with what an
4   associate said.
5   Q        What do you understand the
6   associate claimed he heard you say?
7   A        From what they told me, they said
8   I referred to Eric as a white boy who don't
9   know what he's doing was the exact words
10  that was told to me.
11           (Defendant's Exhibit No. 7
12           was marked for identification.)
13  Q        I will represent to you -- well,
14  let me ask you, have you ever seen Exhibit
15  Number 7 before?
16  A        I have never seen like this paper
17  right here before, no.
18  Q        Not even after this lawsuit
19  began?
20  A        After the lawsuit began the first
21  time I seen any documents or any statements
22  from associates was Saturday when I met with
23  my attorney.

Page 127

1   Q        I don't want to -- I don't want
2   you to tell me what y'all talked about, but
3   that answers my question.
4           Have you ever seen a hotline
5   ticket before?
6   A        I don't even know what a hotline
7   ticket is.
8   Q        I'll represent to you that when
9   an associate makes a hotline call -- and
10  you've testified that you've made them
11  yourself -- that the hotline call is then
12  transcribed onto a hotline ticket and then
13  sent back to the store for investigation.
14  A        Okay.
15  Q        Now, you testified that you had
16  made hotline calls in the past yourself. I
17  will represent to you that this is the
18  hotline call ticket that -- that was made on
19  you. And it reads here and it's alleged
20  that you had stated that the f'ing white boy
21  ain't going to help us because he's out for
22  himself and that you had made that statement
23  about Mr. Olsen. Do you see where I'm

Page 128

1   reading from?
2   A        Yes.
3   Q        And that you were also alleged --
4   other witnesses have stated that Reginald
5   allegedly has made other statements about
6   Eric being quote, white boy, end quote. Do
7   you see where I've read from that?
8   A        Yeah, yes.
9   Q        And then Danielle McCaskey
10  alleged that Reggie had made a statement
11  about a workplace violence incidence and
12  Reggie made the comment if he lost his job,
13  he would come back and quote, shoot the
14  place up, end quote. Do you see where I've
15  read from that?
16  A        I don't see that part.
17  Q        That was --
18  A        Okay. Yeah -- I see it now.
19  Q        Now, understanding that you've
20  not seen this hotline ticket before, but you
21  did understand during the course of the
22  investigation that followed that you were
23  basically accused of having made racially

Page 129

1   derogatory statements about Mr. Olsen and
2   that you had made a comment about potential
3   workplace violence. Did you -- that was
4   your understanding during this
5   investigation?
6   A        There was no investigation about
7   this.
8   Q        Do you deny that you gave a
9   written statement to Mr. Chandler and
10  Mr. McCastle?
11  A        Oh -- McCastle?
12  Q        I'm sorry. Kirkpatrick
13  A        Oh, Kirkpatrick, yeah. Yeah, I
14  did. About this incident?
15  Q        Yes.
16  A        Yeah, I did, denying the whole
17  incident.
18  Q        And you understand that that was
19  in the context of an investigation --
20  A        I didn't -- I didn't know at the
21  time, no, I didn't. Nobody told me it was.
22  Q        You do understand that now?
23  A        I do now.



Page 130

1        (Defendant's Exhibit No. 8
2        was marked for identification.)
3    Q        Exhibit Number 8.  This is the
4    statement that you wrote?
5    A        Yeah.
6    Q        You might want to make sure that
7    this is all the pages.
8    A        Yeah.
9    Q        Who did you give this statement
10   to?
11   A        I believe it was Mike Chandler.
12   Q        Was anybody else present during
13   that interview?
14   A        When I brought this statement
15   back -- I didn't give -- I didn't write it
16   right there in the office.  I brought it
17   back.  So, I don't know if anybody else was
18   in the office with Mike when I handed him
19   this statement.
20   Q        Before you wrote this statement,
21   were you interviewed by Mr. Chandler?
22   A        Yeah.  He brought that allegation
23   to my attention.

Page 131

1    Q        How long did that interview last?
2    A        Not very long.
3    Q        15 minutes?
4    A        If that many.
5    Q        More than five?
6    A        More than five.
7    Q        Did he tell you what the -- what
8    the allegations were against you?
9    A        No.  He told me -- the exact --
10   the exact thing that Mike told me was that
11   associates came to him saying that I -- that
12   Eric -- Eric came to him saying that I made
13   a statement to an associate about calling
14   him a white boy.  And then the statement
15   about the workplace violence thing, that
16   was -- that was another time.  That wasn't
17   the day -- that wasn't during the day about
18   this Eric incident.
19   Q        You're saying that the allegation
20   was that you made the statement about
21   workplace violence on another occasion?
22   A        I believe it was.  I'm not sure,
23   but I believe it was.  It was another time,

Page 132

1    I think.  I want to think it was the time
2    that Gary Fuller was there, but I'm not
3    sure.
4    Q        Well, when you were being
5    interviewed by Mr. Chandler, first of all,
6    was Mr. Kirkpatrick in the room?
7    A        I think Kirk was there when --
8    when he brought that to -- you know, I don't
9    remember.  I don't remember.
10   Q        Well, in that interview he told
11   you about both allegations --
12   A        He did?
13   Q        -- correct?
14   A        I don't -- I don't remember.  I
15   don't remember if he told me about both of
16   them.
17   Q        Well, if you look at -- you
18   stated that you wrote this statement in a
19   response as a follow-up to that interview,
20   correct?
21   A        This is supposed to be for that
22   interview, I believe.
23   Q        Did you write it the same day?

Page 133

1    A        Did I write this statement the
2    same day?
3    Q        Yes, sir.
4    A        No.  I wrote it that night when I
5    went home.
6    Q        That night and you brought it
7    back in the next day?
8    A        Yeah.  I brought it back to work
9    with me the following work day.
10   Q        It's dated next to your signature
11   on the last page 1/10/08.
12   A        Okay.
13   Q        That's your handwriting?
14   A        Yes.
15   Q        So, that would have been the 9th
16   that you wrote this, correct?
17   A        That would have been the -- I
18   guess.  If that's the date I've got on it,
19   that's when I wrote it.
20   Q        Also, the page before reads --
21   where you signed it it's dated 1/10/08.  In
22   fact, every date on it appears to be the
23   same, 1/10/08.

Page 134

```
1          So, just to make sure I
2   understand, you wrote it at home that night,
3   the same night after you had this interview
4   with Mr. Chandler?
5   A      Yeah. I mean, I had took it
6   home. I had took this paper -- I had took
7   this paperwork home with me and wrote it.
8   So, if that was the night, that was the
9   night.
10  Q      Well, your statement includes two
11  specific denials, the first of which is on
12  page two of the statement.
13  A      Which is about?
14  Q      That you had never made any
15  racial comments.
16  A      Okay.
17  Q      Do you see that?
18  A      All right. And the second one is
19  what?
20  Q      And then over on the next page,
21  item number two, you specifically denied any
22  conversation about a shooting in a
23  McDonald's restaurant.
```

Page 135

```
1   A      Right, right, yeah. He brought
2   that -- he did bring that up about a
3   McDonald's restaurant. And I was supposed
4   to allegedly -- I was supposed to have been
5   reading the paper and there was -- there was
6   an article in there about an associate at
7   McDonald's that got fired and went and shot
8   everybody at McDonald's.
9          First of all, I don't even read
10  the paper. I don't even read the paper at
11  work. I don't read the paper at all.
12  Q      Understanding -- I mean, I've
13  read your specific denial. You have
14  categorically denied ever making any racial
15  statements at work. And in here you have
16  categorically denied ever making any
17  statement about workplace violence. But you
18  understood as of that day that those were
19  the two essential allegations that had been
20  made against you?
21  A      Yeah. I found out that day.
22  Q      Now, the racial aspect -- the
23  first allegation about making racial
```

Page 136

```
1   statements, you understand that that
2   falls under the umbrella of the
3   anti-discrimination policy, correct?
4   A      I do.
5   Q      What I have referred to before
6   lunch as PD-19?
7   A      Right.
8   Q      And so in that interview with
9   Mr. Chandler you did understand that you had
10  been accused of a violation of PD-19?
11  A      Right, but during that -- during
12  this interview and this investigation right
13  here I didn't even know what a Red Book was
14  or a PD-19. I didn't find that out until
15  after all this took place.
16  Q      So, you're not -- are you telling
17  me that you were not aware that making
18  racial statements was a violation of
19  Wal-Mart policy?
20  A      Oh, yeah. Sure I was aware of
21  that, yeah.
22  Q      So, you understood that you were
23  accused of a violation of Wal-Mart policy?
```

Page 137

```
1   A      Yeah, yes.
2   Q      And whether or not you knew that
3   it was called PD-19, you did know that
4   Wal-Mart had a policy about that and that's
5   what Mr. Chandler's interview with you was
6   about to investigate that allegation,
7   correct?
8   A      Correct.
9   Q      Now, your statement also on --
10  starting on page four and going on -- going
11  on to the following page, which for some
12  reason there was a second number three at
13  the bottom, you had written that you had
14  complaints about associates and employees
15  that you thought were not doing their jobs.
16  Now, is it your statement here that you
17  thought that the associates and Mr. Olsen
18  were making this up?
19  A      Is that what I believe?
20  Q      Yes.
21  A      Yes.
22  Q      And is that the meaning of what
23  you've written in this written statement?
```

Page 138

1    A      Yes.
2    Q      In the interview with
3    Mr. Chandler did you ask him to speak to any
4    specific individual to interview them for
5    evidence about this allegation?
6    A      No.  I didn't trust Mr. Chandler.
7    Q      Well, you had Mr. Kirkpatrick
8    there, too.
9    A      I didn't trust him either.
10   Q      Well, didn't you tell me before
11   that Mr. Kirkpatrick was the friend who had
12   warned you that Jeremy Crook --
13   A      I never said he was my friend.
14   Q      Well, you did tell us that you --
15   that Mr. Kirkpatrick had warned you --
16   A      Yeah, he warned me.
17   Q      -- that Jeremy Crook --
18   A      Yeah, he warned me.  I did say
19   that.
20   Q      Tell us why you didn't trust
21   Mr. Kirkpatrick.
22   A      Kirkpatrick doesn't really follow
23   all the rules in the company and -- and

Page 139

1    stuff like that.  So, I never really trusted
2    Kirk.  You know, Kirk had a sexual
3    relationship with one of the associates in
4    the company, you know, and that he shared
5    with me.  And I knew he wasn't supposed to
6    have a sexual relationship with Diane, his
7    own manager that came from Mike Chandler and
8    Kirk's store, Lakeshore.  And you know,
9    stuff like that.
10          I just -- I couldn't trust him
11   after that, you know, to follow rules and
12   policies and regulations in the store.  I
13   never trusted that guy.
14   Q      And so are you telling us here
15   today that you did not -- you did not
16   participate -- if you had trusted
17   Mr. Chandler, if you had trusted
18   Mr. Kirkpatrick, is there something you
19   would have told them that you did not put in
20   your statement or you did not say in the
21   interview?
22   A      No -- I don't understand the
23   question.

Page 140

1    Q      You told us that the reason that
2    you didn't name names or identify witnesses
3    either in the interview or in this statement
4    is that you didn't trust Mr. Chandler and
5    you didn't trust Mr. Kirkpatrick.
6    A      Okay.  But I --
7          MR. WINSTON:  Object to the
8    form.  You can answer.
9    A      All right.  But name names and
10   identify associates in what -- for what?
11   Q      Well, I asked you if you
12   identified anybody that you thought he ought
13   to talk to, you know, as a witness on your
14   behalf or somebody who had information that
15   would support your defense in this matter.
16   A      No, I wouldn't share that with
17   them.  I have those -- I have those people,
18   but I wouldn't share that with Mike or with
19   Kirk.
20   Q      You wouldn't tell that to either
21   one of them?
22   A      Neither one of them.  No, I
23   didn't trust either one of them.

Page 141

1    Q      If you had a manager taking this
2    interview and investigating these complaints
3    who you did trust, what would you have told
4    that manager different from what you told
5    Mr. Chandler and Mr. Kirkpatrick?
6    A      I would have told them about
7    associates who had information for me that
8    this was all conspired.
9    Q      And who would those be?  That is,
10   if you are comfortable -- if you had been
11   comfortable with a different manager enough
12   to be completely forthcoming, who would you
13   have told him to go and interview?
14   A      There's a few associates.
15   Q      Whose names are?
16   A      I can't remember right now.
17   Q      Did you keep any kind of notes or
18   records --
19   A      I kept notes --
20   Q      -- of who these associates were?
21   A      Just communicated with them.  We
22   just talked.
23   Q      Do you remember any first names?

(Pages 142 to 145)                                                     37

## Page 142

1  A      Not right offhand.  I would have
2  to think about it.
3  Q      Do you remember any nicknames?
4  A      Not offhand.
5  Q      So, you don't have -- sitting
6  here today, other than your memory, you
7  don't have any ability to identify by name
8  or even by nickname any associates that you
9  believe would have supported your case at
10 the time but whose names you didn't trust
11 Mr. Chandler enough to say?
12 A      Right.
13 Q      How many associates are we
14 talking about?
15 A      A few.
16 Q      Is it --
17 A      More than three.
18 Q      No more than three?
19         MR. WINSTON:  You said no more
20 than three or more than three?
21         THE WITNESS:  About three, maybe
22 more.
23 Q      I thought you said no more than

## Page 143

1  three.
2  A      I said about three.
3  Q      Did you trust Kevin Lynch enough
4  to call him?
5  A      I don't believe Kevin Lynch was
6  over our area at the time when I was working
7  Vestavia.
8  Q      David Norman?
9  A      David Norman.  I called David
10 Norman, but it wasn't regarding this
11 situation here.
12 Q      You didn't trust --
13 A      I might have called David -- you
14 know, I might -- yeah, I did.  I called
15 David and talked to McGuire.  I couldn't get
16 David.  His assistant's name was McGuire or
17 McIver or something like that.
18 Q      This was during the time that
19 this investigation was going on?
20 A      This was during the time that I
21 was demoted.
22 Q      After you --
23 A      They had already did their

## Page 144

1  little -- the investigation and everything.
2  Q      After you were demoted --
3  A      Right.
4  Q      -- you called and talked to
5  McIver?
6  A      I called and brought the issue to
7  McIver.  And then what they did -- what they
8  normally do is channel it back down to the
9  district and stuff like that for them to
10 handle it.
11 Q      Did you ever talk to Gary Fuller.
12 A      I talked to Gary -- Gary Fuller
13 was the one that demoted me.  So, we talked
14 about this in the office with Mike.
15 Q      When you talked to Gary, did you
16 name any associates that you thought --
17 A      He didn't ask me.
18 Q      Well, did you decide to offer
19 that --
20 A      No, I didn't.
21 Q      -- the names of any associates
22 that --
23 A      No.

## Page 145

1  Q      In the meeting with Mr. Chandler
2  did you even tell him that there are
3  associates who will back me up, but I'm not
4  going to tell you who they are?
5  A      No.  He didn't ask me and I
6  didn't tell him.
7  Q      You didn't even volunteer that?
8  A      No, I didn't.
9  Q      Is Exhibit Number 8 to the best
10 of your recollection a true and accurate
11 copy of what you wrote in your own
12 handwriting and gave back to Mike Chandler?
13 A      I believe it is, but I have a
14 copy of this same thing myself.  So, I will
15 have to look at it when I get home.  Because
16 I copied it before I gave it to them.  So, I
17 have an actual copy at home.
18 Q      So, if for some reason you find
19 something different, you're going to let
20 your attorney know?
21 A      Absolutely.
22         (Defendant's Exhibit No. 9
23         was marked for identification.)

38

Page 146

```
1    Q       This is Exhibit Number 9.  Do you
2    recognize whose handwriting that is?
3    A       Yeah -- well, no, I don't
4    recognize the handwriting.
5    Q       Do you know who wrote it?
6    A       It says Eric Olsen.
7    Q       No, no.  I'll represent to you
8    that that's not who wrote it.  That is --
9    A       Okay.
10   Q       That is the block where the --
11   where the individual making the complaint's
12   name is recorded.
13   A       All right.
14   Q       It shows the investigating
15   manager's name is Mike Chandler.
16   A       Okay.  Over here, yeah.
17   Q       And associates reporting this
18   conduct, Eric Olsen and Yuri Boswell.  Do
19   you see that?
20   A       Okay.
21   Q       Underneath Mr. Chandler's name?
22   A       Yeah, I see Yuri's name.
23   Q       Again, my question is I think you
```

Page 147

```
1    said you do not recognize whose handwriting
2    this is?
3    A       I didn't and I don't.
4    Q       Have you seen this document
5    before today?
6    A       No, I haven't.
7    Q       Not even during the preparation
8    for your deposition?
9    A       No.  I must have missed this
10   one.  If it was there, I didn't see this
11   one.
12   Q       This records that Eric Olsen
13   reported that you had used a racial slur
14   when speaking to associates about him, and
15   the quote is "that fucking white boy".  Do
16   you see where that's written on the first
17   page?
18   A       Yeah.
19   Q       And then the second statement is
20   reported by Yuri Boswell that Reggie had
21   made comments about shooting the place up.
22   Do you see that?
23   A       Right.
```

Page 148

```
1    Q       Again, this was your
2    understanding of what this investigation was
3    about, these two allegations against you?
4    A       Right.
5    Q       Page two, this shows that the
6    following witnesses were interviewed:  Yuri
7    Boswell, Eric Olsen, Dwayne White, Danielle
8    McCaskey, Rita Raines, Kenneth Chestnut,
9    Ronnie Hunter and Reginald Gilbert.  Do you
10   see that?
11   A       I do.
12   Q       To your knowledge, were all of
13   these people interviewed in connection with
14   this investigation?
15   A       Yeah.  That's what you're telling
16   me.
17   Q       You don't have any reason to
18   believe that these individuals were not
19   actually interviewed, correct?
20   A       Oh, no, I don't have any reason
21   to believe they were not interviewed.
22   Q       Is there anybody that you believe
23   Mr. Chandler should have interviewed but
```

Page 149

```
1    whose name is not on this list?
2    A       I can't answer that question.  I
3    mean, I don't know.
4    Q       Let's look over on the next page
5    that's got writing on it.  It shows that
6    alleged comment number one about fucking
7    white boy.  The determination was that it
8    had occurred as alleged, and the reason
9    written here is although Reginald denies
10   anything ever being said similar to the
11   racist statement, six other associates gave
12   statements that he used racist names several
13   times or racist remarks.  Maybe I didn't
14   read that handwriting.  Do you see where
15   I've read that?
16   A       I do.
17   Q       And that was the finding in this
18   investigation on allegation number one,
19   correct?
20   A       Yes.
21   Q       I understand that you deny it,
22   but nevertheless, that was the finding?
23   A       Yes.
```

Page 150

1  Q       Look over on number two.  This is
2  the allegation about shooting up the
3  workplace.  Do you see there the block is
4  checked that says cannot be substantiated?
5  Do you see where that shows --
6  A       I do.
7  Q       Reasons supporting
8  determination:  "Only one associate actually
9  gave a statement saying Reginald made such a
10 comment and Reginald denies saying it.  It
11 is one person's word against his."  Did I
12 read that correctly?
13 A       You did.
14 Q       So, you understand from this
15 document that this shows that that
16 allegation was not substantiated, correct?
17 A       Yes.
18 Q       And it was not substantiated
19 because you denied it, even though another
20 person said you did it.  That's what that
21 reads, correct?
22 A       Yes.
23 Q       So, Mr. Chandler in that instance

Page 151

1  found in your favor, right?
2  A       I mean --
3          MR. WINSTON:  Object to the
4  form.
5  A       -- you said it wasn't
6  substantiated, right?
7  Q       Right.
8  A       Okay.
9  Q       He certainly did not find that
10 there was evidence sufficient to believe
11 that you had violated policy on that
12 allegation.
13 A       Okay.
14 Q       But his logic for finding that
15 you had violated policy on the first
16 allegation was that several other associates
17 also stated that you had used racial remarks
18 in the workplace, that it wasn't just one
19 against one.  Understood?
20 A       I understand.
21 Q       Do you understand that that's the
22 logic reported here?
23 A       I understand what was recorded

Page 152

1  there.
2  Q       And you cannot think of anybody
3  else that you believe Mr. Chandler should
4  have interviewed but didn't?
5  A       There was more staff in the
6  store.
7  Q       Well, you told us that you did
8  not ask him to interview anybody else, that
9  you held certain names back to yourself and
10 didn't share them with him?
11         MR. WINSTON:  Object to the
12 form.
13 Q       Correct?
14 A       No.
15 Q       No?
16 A       I didn't say I held back names.
17 I didn't -- he didn't ask me and I didn't
18 ask him.
19 Q       Well, you said that you knew of
20 other people that you thought he should have
21 talked to.
22 A       No.  You asked me do I know other
23 people and I said I don't offhand right now.

Page 153

1  Q       Well, let me ask you this way
2  then:  When you were sitting there in that
3  interview with Mr. Chandler, did you tell
4  him, hey, so and so knows that this
5  allegation is false, go talk to him?
6  A       No.
7  Q       Did you tell him I think the
8  following individuals ought to be talked to?
9  A       No.
10 Q       My question again is other than
11 the folks who are listed here in Exhibit
12 Number 9 who gave statements to
13 Mr. Chandler, do you know of anybody else
14 who had information relevant to these
15 allegations who should have been
16 interviewed?
17         MR. WINSTON:  Object to the
18 form.
19 A       Not offhand I don't.
20         MR. WINSTON:  Can we take a
21 break?
22         MR. HARBUCK:  Sure.
23         (A break was taken at 2:13 p.m.